**COCA–COLA BOTTLING COMPANY OF ELIZABETHTOWN, INC., et al., Plaintiffs,**

v.

**The COCA–COLA COMPANY, a Delaware corporation, Defendant.**

**Civ. A. Nos. 81–48 (MMS), 87–398 (MMS).**

United States District Court, D. Delaware.

Aug. 2, 1988.

---

Edmund N. Carpenter, II, Charles F. Richards, Jr., Jesse A. Finkelstein of Richards, Layton & Finger, Wilmington, Del. (Emmet J. Bondurant, Jane V. Vehko, and Jeffrey D. Horst of Bondurant, Mixson & Elmore, Atlanta, Ga., of counsel), for plaintiffs.

Andrew B. Kirkpatrick, Jr., and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Frank C. Jones, Chilton Davis Varner, and Dwight J. Davis of King & Spalding, Atlanta, Ga., of counsel), for defendant.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

There are several motions now pending before the Court in this case (the "Coke case") and in two other cases (C.A. Nos. 83–95 and 83–120, the "diet Coke cases"),[1]

---

1. The thirty plaintiffs still in the case are listed below:

Coca–Cola Bottling Company of Magnolia
Sacramento Coca–Cola Bottling Company
Coca–Cola Bottling Company Elizabethtown
Coca–Cola Bottling Company Shelbyville
Trenton Coca–Cola Bottling Company
Kelford Coca–Cola Bottling Company
Wilmington Coca–Cola Bottling Works, Inc.
Plymouth Coca–Cola Bottling Company
Coca–Cola Bottling Company of Dickinson
Coca–Cola Bottling Company Jamestown
Coca–Cola Bottling Company Williston, North Dakota
The Cleveland Coca–Cola Bottling Company
Coca–Cola Bottling Company LeHigh Valley d/b/a Abarta
Laredo Coca–Cola Bottling Company
Marshall Coca–Cola Bottling Co. Liquidating Trust
Central Coca–Cola Bottling Company
LaCrosse Coca–Cola Bottling Company
Arkansas–Georgia Co.
Love Bottling Co.
Coca–Cola Bottling Company of Streator

involving, inter alia, contract claims between The Coca–Cola Company (the "Company") and certain of its bottlers (the "bottlers"). The bottlers brought the Coke case in 1981, charging that the Company had breached its agreements with them by supplying Coca–Cola syrup sweetened with fructose (high-fructose corn syrup or "HFCS") rather than sucrose—without the bottlers' consent. The bottlers also claim the Company has overcharged them for syrup and injured them in other ways.

In part the Coke and diet Coke cases have their genesis in earlier contract litigation between the Company and then-existing "parent" bottlers in 1920 and 1921 (the "1921 litigation"). The parties resolved the 1921 litigation through consent decrees (the "Consent Decrees"), which incorporated as a judgment of this Court the amended contracts between the parent bottlers and the Company and resolved the major issue between the Company and the parent bottlers concerning the term of the contracts. *The Coca–Cola Bottling Co. v. The Coca–Cola Co.*, 269 F. 796 (D.Del.1920). In keeping with the initial ruling of the Court on the plaintiff parent bottlers' preliminary injunction motion and prior to any decision on appeal, the Company accepted the bottlers' position that their contracts were perpetual, rather than terminable at will. The contracts between the parent bottlers and the "actual," or "first-line" bottlers, who were more or less the predecessors of the current plaintiffs, were also amended as a result of the 1921 litigation. The contracts now in force between the plaintiffs and the Company derive from the 1921 contracts, and as a result are perpetual as well. Consequently, this court has acknowledged, and the parties apparently agree, that the Consent Decrees retain vitality despite the intervening years and the gradual acquisition of the parent bottlers by the Company.

However, several questions regarding the enforceability of the decrees by these particular plaintiffs remain. Because of these questions, and because the Court previously has ruled that the plaintiffs in all likelihood lack standing to enforce the decrees as parties, *Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co., (Coke IV)*, 654 F.Supp. 1419, 1445 (D.Del. 1987), the plaintiffs have renewed their motion to intervene in the 1921 litigation.

Additionally, the Company has moved for summary judgment on certain aspects of the plaintiffs' contract claims. In particular, the Company requests this Court to rule as a matter of law that (1) the plaintiffs are not entitled to any damages under Count One of their amended complaint (the "unjust enrichment" count); (2) the plaintiffs' assertions concerning the construction of the term "standard Coca–Cola Bottling Syrup" in connection with Count Two [2] (the "standard syrup" count) be rejected; (3) the applicable statute of limitations bars all or part of the plaintiffs' claims under Count Three (the "market price" count); (4) the plaintiffs are not entitled to any recovery from the fund received by the Company in settlement of sugar industry antitrust litigation (the *"Western Sugar"* count); and (5) the plaintiffs lack standing to enforce the 1921 consent decrees.

---

Natchez Coca–Cola Bottling Company [*]
Coca–Cola Bottling Company Jefferson City
Coca–Cola Bottling Company Macon
Coca–Cola Bottling Company Deming
Coca–Cola Bottling Company Tulsa
Coca–Cola Bottling Company Brownsville
Coca–Cola Bottling Company San Angelo
Las Cruces Coca–Cola Bottling Company
Coca–Cola Bottling Company Tucson
Coca–Cola Bottling Company Inc. (Alexandria)
The last eleven bottlers (starting with Streator) have amended their contracts with the Company and are only seeking the damages they allegedly incurred prior to amending their contracts.

[*] Mary Louise Goodrich, Mary Louise Kay Robinson, individually and as trustee of the Kendall family inter vivos trust, Ann Kay Hobson Haack, individually and as trustee of the Kendall family inter vivos trust, John K. Hobson, Margaret Dodge Hobson, individually and as trustee of the Kendall family inter vivos trust, were substituted as plaintiffs for Natchez Coca–Cola Bottling Co., Inc., as of November 12, 1987.

2. Count Two of the plaintiffs' original complaint was dropped. As referred to herein, Count Two means Count Two of the Supplemental Complaint (Dkt. 570).

The plaintiffs have cross-moved for summary judgment on the *Western Sugar* action. Both sides agree that this issue is ripe for decision as if tried on a paper record. Accordingly, that portion of this opinion concerning *Western Sugar* will constitute the Court's findings of fact and conclusions of law in keeping with Federal Rule of Civil Procedure 52.

This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), (c) (1982).

## I. BACKGROUND

After more than seven years of pre-trial jousting, the cases brought against the Company by certain of its bottlers (C.A. Nos. 81–48, consolidated with No. 87–398; 83–95, and 83–120) (respectively, the "Coke case," and the "diet Coke cases") have been set for trial commencing on September 21, 1988. To date, the litigation has provided the raison d'etre for no less than nine opinions,[3] and this Court's pronouncements alone are beginning to approach the bulk of the Saga of Eric the Red. If the parties' briefs and appendices are included, not to mention the record, the cases take on prodigious dimensions.

Although several of the previous Coke and diet Coke opinions have narrated portions of the history of the Company and its bottlers, at this juncture a full picture of that history is appropriate. The following is a composite of the factual summaries of several previous opinions. Any resemblance to those earlier summaries and to the plaintiff Elizabethtown's brief for class certification Docket Item ("Dkt. 60") is entirely intentional.[4]

### A. *The Genesis of the Bottling System*

To begin at the very beginning: in 1886, an Atlanta pharmacist, Dr. John Styth Pemberton, developed the formula for Coca-Cola. Soon afterward, Asa G. Candler, also a pharmacist and owner of a wholesale drug company, purchased an interest in the formula and trademark and formed The Coca–Cola Company to market Coca–Cola syrup to drugstores as a fountain beverage.

The story continues in 1899, when two Chattanooga lawyers, B.F. Thomas and J.B. Whitehead, bought the rights to receive Coca–Cola syrup at a fixed price for vending in "bottles or other receptacles." Thomas and Whitehead also received certain trademark rights. The rights conveyed to Thomas and Whitehead extended throughout the United States, with some

---

**3.** For ease of reference, citations to previous Coke and diet Coke opinions will conform to the following format:

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co.*, 95 F.R.D. 168 (D.Del.1982) (initial denial of class certification)—(*Coke I*)

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co.*, 98 F.R.D. 254 (D.Del.1983) (opinion on reargument granting limited class certification)—(*Coke II*)

*Coca–Cola Bottling Co. of Shreveport v. The Coca–Cola Co., Alexandria Coca–Cola Bottling Co. v. The Coca–Cola Co.*, 563 F.Supp. 1122 (D.Del.1983) (denying preliminary injunction) —(*Diet Coke I*)

*Alexandria Coca–Cola Bottling Co. v. The Coca–Cola Co.*, 637 F.Supp. 1220 (D.Del.1984) (denying plaintiffs' summary judgment motion)—(*Diet Coke II*)

*Coca–Cola Bottling Co. of Shreveport v. The Coca–Cola Co., Alexandria Coca–Cola Bottling Co. v. The Coca–Cola Co.*, 107 F.R.D. 288 (D.Del.1985) (mandating disclosure of secret formulae)—(*Diet Coke III*)

*Coca–Cola Bottling Co of Shreveport v. The Coca–Cola Co., Alexandria Coca–Cola Bottling*

*Co. v. The Coca–Cola Bottling Co.*, 110 F.R.D. 363 (D.Del.1986) (preclusion order)—(*Diet Coke IV*)

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co.*, 654 F.Supp. 1388 (D.Del. 1986) (findings of fact and conclusions of law following trial of class issues)—(*Coke III*)

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co.*, 654 F.Supp. 1419 (D.Del. 1987) (plaintiff's summary judgment motion on standing)—(*Coke IV*)

*Coca–Cola Bottling Co. of Elizabethtown v. The Coca–Cola Co.*, 668 F.Supp. 906 (D.Del. 1987) (plaintiffs' motion for preliminary injunction denied; amendment of complaint to request further relief allowed)—(*Coke V*)

**4.** For a history drawn from more conventional secondary and primary sources, see P. Watters, Coca–Cola: An Illustrated History (1978); The Coca–Cola Company, An Illustrated Profile (published by the Company in 1974); and Plaintiffs' Exhibit 1, trial of class issues, reproducing the record on appeal to the Third Circuit Court of Appeals in *The Coca–Cola Bottling Co. v. The Coca–Cola Co.*, No. 2651 (3d Cir.1921) ("PX 1").

exceptions,[5] and were exclusive, i.e., the Company did not reserve the right to bottle Coca–Cola itself, but only retained the right to manufacture syrup for sale to Thomas and Whitehead and for distribution to soda fountains.

Under the terms of the contracts with the Company, Whitehead and Thomas agreed to "establish in the city of Atlanta, as soon as the necessary machinery and buildings can be obtained, a bottling plant for the purpose of bottling a mixture of Coca–Cola syrup preparation with carbonic acid and water." *The Coca–Cola Bottling Co. v. The Coca–Cola Co.*, 269 F. 796, 800 (D.Del.1920) (*"Coke 1920"* or *"Judge Morris's opinion"*) (quoting 1899 contract). Expenses relating to construction and operation of the plant were to be borne entirely by Whitehead and Thomas. They agreed to "put up in bottles or other receptacles, a carbonated drink containing a mixture of the Cola–Cola Syrup and water charged with carbonic acid gas under a pressure of more than one atmosphere." *Id.* Under the contract, the syrup was to be mixed with at least one ounce of syrup to eight ounces of water.

Other provisions of the contract obliged Whitehead and Thomas to provide the consumers with a "sufficient quantity" of the drink "to supply the demand in all territory embraced in this agreement," or else forfeit certain of their rights; to buy all the "Coca–Cola syrup necessary to a compliance with this agreement" directly from [the Company]; to refrain from using substitutes for the syrup or to use the syrup in any way other than that specified; and to sell unbottled syrup only with the written consent of the Company. *Id.*

Thomas and Whitehead formed Coca–Cola Bottling Company, a Tennessee corporation, in December 1899. Shortly after the formation of the Cola–Cola Bottling Company, Thomas and Whitehead, disagreeing about the terms of the contracts between their company and the bottlers who would actually bottle Coca–Cola (the "actual" or "first-line" bottlers), divided the business. Thomas retained the original bottling company (the "Thomas Co."), along with the bottling business in approximately fifteen states, and conveyed rights to the bottling business in the remainder of the states to Whitehead. Whitehead and a new partner, J.T. Lupton, named their bottling company "The Coca–Cola Bottling Company" (the "Whitehead–Lupton Co."). The Coca–Cola Company, the Whitehead–Lupton Co. and the Thomas Co. joined the "parent bottlers"[6] in amending the 1899 agreement to reflect the new bottling company.

The two bottling companies, unable to meet demand themselves and thus fulfill their obligations under the contract,[7] contracted with actual bottlers who invested in and operated plants as well as bottled, promoted, and sold Coca–Cola in various exclusive territories assigned to them. By 1920, the amount of the investment in "physical properties" by the actual bottlers outstripped that of the Company by a ratio of five to one. *Coke 1920*, 269 F. at 801. Manufacture, shipment, and bottling were performed by the Company and the actual bottlers. The parent bottlers' contribution to the process consisted primarily of recruiting actual bottlers and otherwise developing the bottling business.

In 1915, the contracts between the Company and the parents were further modified to accommodate changes in the antitrust laws brought about by passage of the Clayton Act. The corresponding contracts between the parents and the actual bottlers also were modified.

The Coca–Cola Company was purchased by a banking syndicate in 1919 and became

---

**5.** The six New England states, Mississippi, and Texas were excluded.

**6.** The Whitehead–Lupton Co. and the Thomas Co. further divided their respective territories among other parent and "subparent bottlers." Subparent bottlers of the Whitehead–Lupton Co. included Western Coca–Cola Bottling Co. and The Coca–Cola Bottling Co. (1903); subparents of the Thomas Co. were Coca–Cola Bottling Works, Coca–Cola Bottling Works 3d, and Pacific Coca–Cola Bottling Co.

**7.** Only the first two bottling plants, built in 1899 and 1900, were owned and operated by Thomas and Whitehead.

a Delaware corporation, which assumed all the Georgia company's previous obligations to the parent bottlers.

From 1899 until the bottlers filed suit in 1920, several changes in the formula for Coca–Cola syrup occurred. The most important of these changes for present purposes was the elimination of saccharin from the syrup produced after 1907. Another change was the development of different formulae for fountain syrup and bottlers' syrup. Among other differences, bottlers' syrup includes more sugar than fountain syrup. Prior to 1906, the Company had used a combination of saccharin and sugar to sweeten the syrup. That year marked the passage of the Pure Food and Drug Act, following which the Company began using granulated sugar in lieu of saccharin. The parties agreed to an increase in the price of syrup to reflect the higher cost of the sweetener. Refined granulated sugar became the most expensive ingredient used in the manufacture of syrup.

World War I severely affected the sugar market, and thus the Company's costs of producing syrup. Among other things, the war brought rigid price controls and rationing. The Company, and its bottlers, who were also purchasers of large amounts of sugar, were permitted to buy only 50% of their requirements. At the end of the war, the removal of price controls and a severe shortage of sugar combined to produce a rise in the price of sugar from nine cents a pound in September 1919 to over twenty-seven cents a pound in June, 1920.

Sugar rationing spurred experimentation with new sweeteners. A division of the United States Department of Agriculture ("USDA") tested corn syrup and corn sugar for suitability as substitutes for conventional granulated sugar, and concluded that the substitutes "[could] be used to replace one-fourth to one-half of the amount of sugar ordinarily used [in soft drinks], thereby effecting a saving of approximately 50,000 tons of sugar a year." Dkt. 60 at 20 (quoting research published by the USDA's Bureau of Chemistry titled "Formulas for Sugar–Saving Sirups [sic]"). At about the same time, the Company began substituting corn syrup for sugar in order to attempt to meet demand.

**B. *The 1920 Litigation***

The extreme rise in sugar prices led the parent bottlers to agree to permit the Company to pass on sugar price increases in excess of nine cents per pound to the actual bottlers. The Company then sought to enter into new contracts with the parents that would allow the Company to raise syrup prices based on the Company's manufacturing costs. The bottlers insisted on obtaining specific information regarding the manufacturing costs. When the Company refused to disclose the cost information, offering only "the integrity and good faith of The Coca–Cola Company," Plaintiffs' Exhibit ("PX") 1 at 1580, for verification, the parent bottlers rejected the proposal of flexible pricing, which precipitated a confrontation. The Company took the position that its contracts with the parent bottlers were terminable at will and the parent bottlers demanded that the Company acknowledge the perpetual nature of their contracts. The Company responded to the demand by informing the parent bottlers that their contracts were terminated as of May 1, 1920.

After initially filing suit against the Company in Georgia, the two parent bottlers withdrew the suit and refiled in the United States District Court for the District of Delaware on June 1, 1920, seeking to enjoin the Company from terminating their contracts. Six first-line bottlers intervened in support of the parent bottlers. What occurred during the pendency of that litigation is described in *Coke III*, 654 F.Supp. at 1394–95:

> On June 10, 1920, the parties to the Delaware litigation agreed to entry of an order requiring the Company to supply the parent bottlers' and actual bottlers' requirements of Coca–Cola Bottlers Syrup during the pendency of the litigation. Under the terms of the Order, the price of the syrup paid by the actual bottlers to the parent bottlers was fixed at $1.72 per gallon for 5 months (until November

1, 1920), by which time it was anticipated a final decision on the applications for interlocutory injunctions would have been rendered. The Order further provided that if the final decision had not issued by November 1, 1920, the syrup price would be increased or decreased from the $1.72 level based upon increases or decreases in the Company's actual costs of manufacture of the syrup.

During the negotiations leading to the June 10 Order, it appears the Company failed to disclose fully that it had entered into substantial long-term sugar contracts at prices near the top of the market. The bottlers were given to understand, from representations made in an affidavit filed on June 7, 1920 by Charles H. Candler, then Chairman of the Board of The Coca–Cola Company, that the Company had favorable long-term sugar contracts "very much lower than the present market price." Charles Rainwater, in a letter to Candler dated January 14, 1921, recollected Candler's statements to the bottlers:

> You represented that The Coca–Cola Company had but one written contract, which expired in about three weeks, and one verbal contract, under which the market price each Monday morning was controlling.

Although the price of sugar dropped steadily from its peak in June, 1920, the price of syrup to the parent and actual bottlers under the June 10, 1920 Order remained fixed. Thus, while competing soft-drink prices fell, the retail price of Coca–Cola remained high. Actual bottlers suffered a loss in sales volume. The Chairman of The Coca–Cola Company reported that the Company's total sales volume of syrup (which included both bottle and fountain syrup) declined 53% in September, 1920 and 50% in October, 1920, because of the high price of syrup.

The bottlers expected relief on November 1, based on their understanding of the Company's sugar contracts. Instead, with the market price of sugar continuing to fall, the Company announced a price increase for its syrup in November,

1920, in order to recoup the cost of its inventories of high-priced sugar. The Company also announced price increases in December, 1920, and January, 1921. The bottlers agreeing in the June 10 Order to a price for syrup based upon the Company's total manufacturing cost quickly discovered they had unwittingly exposed themselves to and insulated the Company from the hazards of the marketplace. The Company required the bottlers to pay for the Company's poor judgment in overpurchasing high-priced sugar, while it continued to receive fixed profits per gallon of syrup. Both The Coca–Cola Company and especially the actual bottlers found themselves in a precarious economic position while maintaining an increasingly antagonistic negotiating posture.

The Company represented its costs of manufacture under the June 10 Order had increased because of long-term sugar contracts at high prices. The parent bottlers, in disbelief, demanded verification of the Company's figures. The bottlers' audit revealed discrepancies, and the Company and the parent bottlers were unable to reconcile their figures or even agree on items of overhead to be included in the cost calculation. When the Company in January 1921 announced an estimated February cost of manufacture of $1.85, the bottlers took new action. In February, a parent bottler and actual bottlers filed supplemental complaints accusing the Company of fraud in the negotiation of and operation under the Order and sought appointment of a special master to determine the syrup cost under the terms of the Order.

*Id.* (citations omitted).

In *The Coca–Cola Bottling Co. v. The Coca–Cola Co.*, 269 F. 796 (D.Del.1920), the Court granted the parent bottlers' motions for preliminary injunctions, stating that their contracts with the Company were perpetual and that the parent bottlers had received property rights in the bottling business from the Company. *See* 269 F. at 816. On July 6, 1921 while an appeal was pending, the parties executed separate set-

tlement agreements—one between the Company and Whitehead–Lupton parent bottler, and the other between the Company and the Thomas parent bottlers. The Court formally incorporated those agreements as final judgments on October 4, 1921.[8]

8. The decree incorporating the settlement agreements reads in pertinent part as follows:

It appearing to the Court that the above stated cause is now ripe for final decree; that the parties thereto, including all of the Intervenors actually intervening in said cause, have entered into an agreement settling and compromising said case and all questions of difference thereon arising, an original signed copy of which contract has been exhibited to the Court and a true and correct copy of which is hereto attached as Exhibit 1, and Counsel representing the several parties to said cause moving the Court to make said agreement of compromise and settlement the decree of the Court in said cause, and all parties in open court consenting thereto,

IT IS ORDERED, ADJUDGED AND DECREED: That said agreement or settlement and compromise, as the same appears attached hereto as Exhibit 1, be and the same is made the decree of this Court; and that it is so accordingly adjudged and decreed by the Court.

See Motions for Leave to Intervene and to Consolidate, Dkt. 110, exhs. G, H (the "Consent Decrees"). The settlement agreement incorporated in the Thomas Co. case (exh. G) is reproduced in pertinent part below:

THIS AGREEMENT, made and entered into on this the 6th day of July, A.D. 1921, by and between COCA–COLA BOTTLING COMPANY, a corporation under the laws of the State of Tennessee, party of the first part, and THE COCA–COLA COMPANY, a corporation under the laws of the State of Delaware, party of the second part:

WITNESSETH:

1: It being recognized that the primary obligation of all parties hereto, as well as all other individuals and Bottling Companies who employ the name Coca–Cola, in their corporate or trade name, is to promote the sale of Coca–Cola, and in consideration of the benefits to be derived by the parties to this instrument from the settlement of all matters of controversy between them in the above stated case, said case is hereby compromised and settled and this agreement is to be presented to the Circuit Court of Appeals and be made the judgment and decree of the proper Court.

2: The present contract between the said parties described in the pleadings in the above entitled cause, as hereby expressly modified and changed, shall remain of full force and effect, and is hereby agreed to be perpetual, and the same shall apply to the parties hereto and their respective successors and assigns; but no assignment shall be made by the party of the first part without the consent of the party of the second part, as provided in the original contract.

3: The said contract as hereby modified shall operate perpetually, but if abnormal or burdensome conditions or occurrence prevail and the said parties fail to agree on a modification of prices and terms to meet such abnormal or burdensome conditions or occurrence *and* to continue during the same, then either party shall have the right to demand arbitration as to the price and terms; and if they disagree as to whether or not abnormal or burdensome conditions or occurrence exist, then that question shall also be arbitrated.

4: No forfeiture of any kind shall ever take place under the said contract as hereby amended until after the party of the first part shall have ninety (90) days written notice and opportunity to correct the conditions complained of, and if not corrected within said time and grounds of forfeiture exist, such forfeiture shall then occur; and if any forfeiture should ever arise as to any territory by reason of the act of any actual or sub-bottler, said forfeiture shall only apply to and embrace the territory supplied by the bottling plant of said offending actual or sub-bottler, and shall not extend to, nor cover, territory covered by the territory of any other bottler, even though said territory was obtained from or through the offending bottler.

5: The parties hereto raise the contract price of Coca–Cola Bottlers Syrup as fixed by said existing contract to one dollar and seventeen and a half cents ($1.17) per gallon delivered as heretofore, including five cents (5¢) per gallon for advertising matter to be delivered at actual cost and freight expenses, and said party of the first part is hereby relieved and discharged from any and all obligations to spend anything for advertising; but it shall be bound to sell and deliver, at such actual cost, the same amount of advertising matter delivered to it by the party of the second part, to the actual Bottlers, as herein provided for. The party of the first part furthermore agrees to pay an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; same to include all possible increases in the cost of producing such syrup by the party of the second part other than may arise under, and as provided for by the arbitration clauses herein.

6: In order to promote the sale of Coca–Cola and enable the actual bottlers to compete with other beverages, the party of the first part hereby agrees to sell such syrup to the bottlers purchasing from it a not exceeding one dollar and thirty cents ($1.30) per gallon, including five cents (5¢) per gallon for advertising matter to be delivered, and an addition-

The Consent Decrees amended and clarified the contracts between the Company and the parent bottlers. Paragraph 1 of the agreements declare "that the primary obligation of all parties hereto, as well as all other individuals and Bottling Companies who employ the name Coca–Cola ... is to promote the sale of Coca–Cola." Paragraph 2 memorializes the parties' agreement that the contracts between them "shall remain of full force and effect" and "be perpetual," and provides that the parent bottlers must obtain the consent of the Company to any assignments made under the contract. The third paragraph establishes a mechanism by which "either party" may "demand arbitration" in the event of "abnormal or burdensome conditions."[9] The fourth paragraph governs forfeiture, and applies expressly to actual bottlers as well as parent bottlers. Paragraph 5 fixed the price of syrup to the parents at $1.17½ per gallon, and established a formula to accommodate changes in the price of sugar. The parties designed the pricing formula so that it would be triggered when the price of sugar rose above seven cents per pound. For every increase in the price of sugar above seven cents/pound, the bottlers agreed to pay six additional cents per gallon of syrup.[10] The pricing formula was "to include all possible increases in the cost of producing such syrup" by the Company, other than those resulting from arbitration. Paragraph 6 lays out the obligation of the parent bottler to sell to the actual bottlers at a maximum price of $1.30 per gallon of syrup, "[i]n order to promote the sale of Coca–Cola and enable the actual bottlers to compete with other beverages." The actual bottlers' price increased on the same basis as that set forth in paragraph 5. Paragraph 7 delineates the method of calculating the market price of sugar. The parties agreed that the price would be determined quarterly, the first seven days of each quarter, "by averaging the market price of standard granulated sugar ... as quoted at [the ten largest domestic refineries]." Paragraph 10 contains the Company's promise that "the syrup sold and furnished by it to the party of the first part [the parent bottler] is to be high grade standard Bottlers Coca–Cola Syrup."

al six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; the party of the first part hereby further agrees that any increase in price or change in terms growing out of any agreement or arbitration as provided under paragraph three hereof shall not be exceeded or increased by it in any sales it may make of said syrup to the bottlers purchasing the same from it.

7: It is agreed between the parties that the price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

. . . .
. . . .

10: The party of the second part contracts that the syrup sold and furnished by it to the party of the first part is to be high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

. . . .

IN WITNESS WHEREOF, the said parties hereto, through their proper officers, and pursuant to resolutions of their respective Boards of Directors authorizing them so to do, have hereunto signed their names and affixed their corporate seals, on the day and date first herein written. In duplicate.

The Whitehead–Lupton decree contains the following paragraphs not found in the Thomas decree:

15: This settlement is conditioned upon the consent of the actual bottlers to the modification of their contracts with the party of the first part in accordance with the terms of this agreement.

16: The parties hereto will request the Court of Appeals to postpone a decision until it can be determined whether such actual bottlers will consent. If such consent cannot be secured by September 1st, 1921, the parties to this agreement will agree upon the plan of procedure, and if they fail so to agree, shall submit the matter to arbitration as to what shall be done in regard thereto.

Except for these paragraphs, the two decrees are identical.

9. Neither side contends that "abnormal or burdensome" conditions exist, and neither has demanded arbitration. See Plaintiff's Brief (Dkt. 60) at 40 n. 18.

10. The price rose on the same basis in the event of a fractional advance in the price of sugar.

Paragraph 10 also provides that the syrup furnished to the bottlers "shall contain not less than five and thirty-two one hundredths (5.32) pounds of sugar to each gallon of syrup." [11]

## C. *1921–1980*

Following the 1921 settlement, the Company gradually acquired all the parent bottlers and subparent bottlers and assumed their obligations to the actual bottlers. By 1975, the Company had completed the acquisitions. In 1978, the Company proposed amendments to the bottlers' contracts to substitute a new formula for pricing syrup using a "sugar element," a "base element," and the Consumer Price Index. The amendment "also contained a provision that in the event the Company modified the formula of Coca–Cola Bottlers Syrup to replace sugar with 'another sweetening ingredient,' the resulting savings would be passed through to amending bottlers." *Coke III*, 654 F.Supp. at 1395. From 1978 until 1987, when the Company withdrew the proposed amendment, a large majority of the bottlers accepted the proposal and modified their contracts. Out of an original group of 102 bottlers, only 42 actual bottlers remained in the litigation by the time of trial of the class issues in 1983, and only 30 now remain. The remaining bottlers continue to purchase syrup and bottle Coca–Cola under the 1921 contracts or contracts that closely resemble those original agreements.

The Consent Decrees contain a provision setting the price of syrup to the bottlers according to a formula which is based upon the "market price" of sugar "as quoted at the refineries by the ten refineries operating in the United States ... at the time, having the largest capacity of output." Consent Decrees, ¶ 7. The impetus for the "market price" term came from the bottlers' disastrous experience with the Company's sugar purchases following World War I and the first several months of the 1920 litigation.

The objective served by tying the syrup price to market price was twofold: (1) to transfer from the bottlers to the Company the economic risks associated with long term sugar purchases; (2) to provide an objective verifiable price for the cost of sugar. *Coke III*, 654 F.Supp. at 1408.

In the period immediately following the entry of the Consent Decrees, the parties disagreed over whether the syrup should be priced at the "quoted," or "list," price, or the actual selling price. This disagreement went unresolved. The Company's later practice, as reflected in a memorandum from a Company vice president to the head of the Company's Purchasing Department, *see Coke III*, 654 F.Supp. at 1416, was to use the actual selling price rather than the higher list price. The Company determined actual selling prices through inquiries of the refiners. The Company discontinued this practice in 1969, when it began using official list prices. Since 1969, in making inquiries of refiners, the Company has requested their "official list prices," which then form the basis for the market price calculation.

In January 1980, the Company started using a new sweetener, high-fructose corn syrup, or HFCS–55 ("HFCS"), in place of granulated sugar made from cane or beets ("sucrose"). HFCS is made "by hydrolysis of corn starch by chemical enzymes." Dkt. 60, at 50. At first, HFCS constituted fifty percent of the sweetener used in the syrup. Later, the Company dropped sucrose from the syrup altogether.

The Company describes the decision to substitute HFCS as having been "reached only after years of research and extensive testing confirmed that this improved version of HFCS was indistinguishable from sucrose when used in Coca–Cola, and that there would be no decline in either the quality or the sales of Coca–Cola if it were used." Defendant's Brief in Support of Motion for Partial Summary Judgment, at 13 (Dkt. 798).

---

**11.** Portions of the remainder of the consent decrees are relevant to the diet Coke cases, and I will discuss them in the opinion directed to the motions filed in those cases. The remaining portions of the consent decrees are not relevant to the present case.

The Company sold HFCS-sweetened syrup to both amended bottlers, i.e., those bottlers that had accepted the 1978 contract amendment, and unamended bottlers operating substantially under the 1921 agreements. Although the amended bottlers received a "pass-through" of the savings to the Company from the use of HFCS, which is cheaper than sucrose, whereas the unamended bottlers did not, the syrup price paid by amended bottlers still exceeded that paid by unamended bottlers.

### D. *1980–1988*

Early in the 1960's, the Company introduced TAB, a diet cola drink. TAB was sold under a separate agreement from the existing contracts. Although by 1983 TAB had built up the biggest market share of any diet soft drink, the Company determined that its market appeal was too narrow to keep up with the rapid expansion in the diet market. Accordingly, the Company created a new product, diet Coke, the name of which "was chosen carefully and focused on the descriptive nature of the word 'diet' and the tremendous market recognition of 'Coke.'" *Diet Coke I*, 563 F.Supp. at 1127. It was the surprise introduction of diet Coke, coupled with the Company's insistence that the bottlers give up rights to recover alleged overcharges while a court determined whether such rights in fact existed, that led to the diet Coke litigation now before this Court.

In 1985, the Company tried to substitute a different formulation of Coca–Cola, called "new Coke," for the old Coca–Cola. When the market reacted unfavorably to the demise of "old" Coke, the Company resumed producing it, under the name "Coca–Cola Classic," or "Classic Coke."

When the Company first introduced new Coke, it was sold under the terms of the existing contracts as Coca–Cola bottlers' syrup. Upon the reintroduction of classic Coke, there were for the first time two Coca–Cola bottler's syrups recognized by the Company: one for new Coke, and one for classic Coke.[12] The Company, however,

is selling the syrup for classic Coke under the previous contract terms "ostensibly" without waiving the right "to decide at a later time that the syrup for Coca–Cola Classic is not Coca–Cola Bottler's Syrup, even though the identical syrup was considered Coca–Cola's Bottler's Syrup" prior to the introduction of new Coke. *Diet Coke III*, 107 F.R.D. at 291.

Also in 1985, the Company further extended its product line with the advent of caffeine-free Coke and caffeine-free diet Coke, Cherry Coke, and, later, diet Cherry Coke.

### E. *Previous Coke and Diet Coke Decisions*

This Court's nine previous published opinions in this case and in the diet Coke cases warrant attention in assessing the parties' arguments. A synthesis being too ambitious a project at this juncture, the following quick overview will aid the discussion.

*Coke I*, 95 F.R.D. 168 (1982): *Coke I* denied the plaintiff Elizabethtown's motion for class certification on the principal grounds that because, at that time, as many as thirty-two different states' laws could be involved, the commonality requirement of Federal Rule of Civil Procedure 23(a) was not satisfied; and because of the necessity of considering different courses of dealing peculiar to individual bottlers, the typicality requirement of Rule 23(a) was not met. In reaching these conclusions, the Court held that the plaintiff lacked standing to enforce the Consent Decrees given the clear statement of the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975) that nonparties to consent decrees may not directly enforce those judgments, "even though they were intended to be benefited by it."

*Coke II*, 98 F.R.D. 254 (1983): The opinion on reargument, *Coke II*, retreated from *Coke I*'s denial of class certification and the standing holding. With regard to commonality, the Court concluded:

---

**12.** The bottlers contend that there were three: new Coke, Classic Coke, and diet Coke.

In the instant case there are common issues of law and fact as to each of the plaintiff's claims. Enforcement of the 1921 Consent Decrees and the Bottler's Contracts, is alleged to be premised, in part, upon the meaning of certain provisions of the Consent Decrees regarding the pricing and composition of Bottler's Syrup. Plaintiff alleges that these provisions were incorporated into all of the Bottler's Contracts and concludes that interpretation of the Consent Decrees is essential to interpreting the Bottler's Contracts. The unjust enrichment claims in Counts I, III and IV are also based, in part, upon the pricing and composition provisions of the Consent Decrees and the Bottler's Contracts. Since resolution of all of these common questions of law and fact will affect all or a significant number of the putative class members, the plaintiff has satisfied the commonality requirement of Rule 23(a)(2).

*Id.* at 265 (footnote omitted).

The plaintiff's showing under the typicality requirement was also reassessed. This reassessment revealed that, although not all of the proposed representative's claims would be typical of those of putative class members, certain of the claims were typical.

Plaintiff alleges that the meaning of terms in the Bottler's Contracts regarding the composition and pricing of Coca–Cola are derived, at least in part, from the 1921 Consent Decrees. Many of these contracts were entered into immediately after entry of the Consent Decrees as final judgments.... Moreover, most, if not all, Bottler's Contracts state that the bottler is assigned certain rights and privileges from its parent bottler—the Thomas Co. or the Whitehead Co.—that the parent originally received from Coca–Cola in a series of contracts, including the Consent Decrees, during the period between 1899 and 1921. Therefore, interpretation of relevant provisions regarding the pricing and composition of the 1921 Consent Decrees will likely be necessary in determining the meaning of similar provisions in the Bottler's Contracts....

*Id.* at 266–67 (footnotes and citations omitted).

Additionally, the Court withdrew its standing holding, concluding that "the Court need not have decided these issues in that they were not necessary for a determination of the class certification motion then before the Court." *Id.* at 264. The standing issues were left to "be addressed when and if a decision is necessary for the proper adjudication of this case." *Id.*

*Diet Coke I,* 563 F.Supp. 1122 (1983): The next installment in the developing epic involved the related diet Coke cases—one brought by bottlers operating under unamended contracts derived from the Consent Decrees (C.A. No. 83–95) and one brought by bottlers who have accepted the Company's 1978 proposal and amended their contracts (C.A. No. 83–120). The plaintiff bottlers in these two unconsolidated cases brought preliminary injunction motions requesting that the Court order the Company to "allow them to purchase diet Coke syrup without waiving their interim rights." *Id.* at 1130. When the Company introduced diet Coke, it took the position that diet Coke was not covered by the existing contracts and that the bottlers would have to negotiate new agreements. Pending agreement, the Company offered the new syrup only to bottlers willing to forgo their claims to the syrup at the existing contract price for Coke syrup until there was a judicial determination that diet Coke syrup fell within the scope of the old contracts.

The bottlers assert that they are faced with a Hobson's choice: accede to the demands of the Company and accept diet Coke pursuant to the Temporary Amendment thereby waiving any right to recover any overcharges during the time the Temporary Amendment is operative; or reject the terms of the Temporary Amendment and thereby lose the opportunity to market diet Coke, incur the wrath of frustrated customers, and risk potential loss of shelf-space and destruction of their businesses.

*Id.* at 1129–30. Noting that the product covered by the original contracts in all like-

lihood must contain 5.32 pounds of sugar, because of the language in paragraph 10 of the Consent Decrees, the Court found that diet Coke syrup was "not likely to be encompassed by the contractual phrase Bottler's Coca–Cola Syrup as employed by the 1921 Consent Decree." *Id.* at 1135. Thus, the unamended bottlers failed to demonstrate probability of success on the merits in this regard. The Court also determined that the unamended and amended bottlers' argument based on their trademark rights (which are identical) failed to establish a probability of success on the merits. *Id.* at 1139.

Unlike the trademark rights, the contractual rights of the amended bottlers differ in a material respect from those of the unamended bottlers. The 1978 amendment contains a provision which states:

> In the event that the formula for Bottle Syrup is modified, in whole or in part, with another sweetening ingredient, the Company will modify the method for computing the Sugar Element in such a way as to give the Bottler the savings realized as a result of such modification....

*Id.* at 1139. The amended bottlers argued that the provision encompasses diet Coke syrup. The Company countered that the clause does not apply because diet Coke is not a modified version of Coke, but rather is a new product. The Court accepted the amended bottlers' position for the purposes of the preliminary injunction, but found no irreparable injury, because the loss of "additional profits ... cannot constitute irreparable harm under the applicable standards." *Id.* at 1141.

*Diet Coke II*, 637 F.Supp. 1220 (1984): *Diet Coke II* denied the amended bottlers' motion for summary judgment on their contractual entitlement to diet Coke based on the existence of a genuine issue of material fact regarding the provisions of the 1978 amendment.

*Diet Coke III*, 107 F.R.D. 288 (1985): The third diet Coke decision concerned the motion by both amended and unamended bottlers for disclosure of Company formulae for certain syrups. The Court found that

(1) the formulae were trade secrets; but (2) the balancing of plaintiffs' need for the information against the injury to the Company favored the plaintiffs. Given the Company's position that Coke and diet Coke are two separate products, the Court therefore ordered the Company to disclose the formulae for diet Coke, new Coke, and classic Coke, but denied the request for disclosure of the formulae for TAB and certain experimental colas.

*Diet Coke IV*, 110 F.R.D. 363 (1986): *Diet Coke IV* arose from the Company's refusal to comply with the order of *Diet Coke III*. The Court responded by entering a preclusion order giving "plaintiffs ... the advantage of every possible inference that fairly could be drawn from the formulae evidence sought." *Id.* at 369. "The governing principle was that the preclusion order must in no way prejudice plaintiff and in no way benefit defendant." The Court further held that the "plaintiffs are entitled to compare the entire formulae, and to obtain a favorable comparison of the entire formulae. Defendant may not qualify those comparisons by noting the difference in sweetener." *Id.*

*Coke III*, 654 F.Supp. 1388 (1986): *Coke III* set forth the Court's findings of fact and conclusions of law subsequent to trial of two certified class issues. In particular the trial revealed that the term "sugar" as used in the Consent Decrees meant "refined granulated sucrose from cane." *Id.* at 1406. The term must be interpreted to include sucrose from beets as well as cane, however, because the Company had begun using beet sugar in 1941 and continued to use it with the bottlers' knowledge and without their objection. *Id.* at 1403. The second certified issue, concerning the meaning of "market price" as used in the decrees, was resolved in favor of the following interpretation:

> "Market price" as used in paragraph 7 of the Consent Decrees means an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users

upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale. . . .

*Id.* at 1418. The Court specifically excluded from the definition the Company's actual cost of purchasing sugar, which might be even lower than the verifiable prices, due to the Company's negotiation with sugar suppliers.

*Coke IV*, 654 F.Supp. 1419 (1987): *Coke IV* mainly treated the bottlers' motion for summary judgment on the issue of their standing to enforce the Consent Decrees. After carefully considering the question of the plaintiffs' ability to enforce the decrees directly as parties, the Court held that (1) the unamended bottlers that trace their contractual rights to the Whitehead–Lupton Company had standing to enforce the decrees directly; but (2) bottlers whose contracts derive from the Thomas Company lacked standing, except with respect to certain rights under the decrees which were assigned to them by the parent bottler.

*Coke V*, 668 F.Supp. 906 (1987): The last episode in the nine-part series resulted from the plaintiffs' preliminary injunction motion brought to prevent the Company from implementing its announced policy to provide the bottlers with sucrose-sweetened syrup exclusively, rather than HFCS-sweetened syrups. The plaintiffs also sought to amend their complaint to drop their request for sucrose syrup and to add a request for an injunction directing the Company to supply HFCS-sweetened syrup and to supplement their complaint to include claims made in the motion for preliminary injunction; i.e., to allege "an additional breach of the Consent Decrees and Bottler's Contracts based on the Company's decision in March, 1987 to supply sucrose syrup to unamended bottlers." *Id.* at 922. The theory of the new claim is that "HFCS–55 syrup is 'standard Bottlers Coca–Cola Syrup,' not sucrose syrup, and

the threatened action breaches the implied duty of good faith." *Id.*

## II. THE SUMMARY JUDGMENT STANDARD

The standard applicable to the consideration of summary judgment motions is laid out in three recent United States Supreme Court decisions: *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). These decisions refocus the summary judgment standard, clarifying the movant and non-movant's responsibilities. The movant must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a crucial element of his or her case. The non-movant must then identify portions of the record which tend to support the allegedly unsupported element. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

Significantly, this trilogy of cases assures the trial court that where the party bears the burden of proof on an issue, and the evidence pertaining to that issue plainly falls short of the party's burden, summary judgment is proper. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11. With these principles in mind, I will turn to the parties' motions.

## III. THE COMPANY'S SUMMARY JUDGMENT MOTION

The Company moves for summary judgment "in whole or in part" on a number of the plaintiffs' claims. Dkt. 798 at 4. First, the Company contends that the plaintiffs' "unjust enrichment" theory of recovery under Count One is deficient as a matter of law because the plaintiffs sue on express contracts. *Id.* ("[t]he law is simply that Plaintiffs are not entitled to the relief they seek under any set of facts."). Second, the Company asserts that it has no duty to provide HFCS-sweetened syrup to the plaintiffs in light of the Court's prior rul-

ings concerning the meaning of sugar and the Company's duty to provide syrup sweetened with sucrose. If the Court accepts this argument, the Company will be entitled to summary judgment on Count Two. The Company also requests summary judgment on the plaintiffs' prayer for punitive damages under Count Two, urging that punitive damages may not be awarded in breach of contract cases. Third, the Company contends that the plaintiffs' claims for damages resulting from the alleged improper calculation of syrup price are barred by the applicable statute of limitations. Fourth, the Company seeks judgment on the plaintiffs' claims to pro rata shares of the settlement proceeds which the Company received as a result of the compromise of the *Western Sugar* litigation. The plaintiffs have cross-moved for summary judgment on the *Western Sugar* claim.[13] And finally, the Company seeks a ruling from the Court that "no Plaintiff has standing to enforce the Consent Decrees." Dkt. 798 at 9.

The plaintiffs vigorously oppose the Company's motion. They have launched a broad defense to the motion in the form of a remarkable argument that "[a]s a result of the special relationship between the Company and the bottlers, The Coca–Cola Company owes the bottlers higher fiduciary duties than the duties associated with ordinary contracts, and must account to the bottlers for any profits obtained in breach of those duties without their consent." Plaintiffs' Brief in Opposition to Defendant's Motion for Partial Summary Judgment and in Support of Plaintiffs' Cross–Motions for Partial Summary Judgment, at 4–5 (Dkt. 811) (citation omitted). In addition, the plaintiffs make more specific arguments countering the Company's position.

Because the plaintiffs' fiduciary duty theory, if valid, will affect dramatically the analysis of four out of the five major Company arguments, I will address this theory first. Next, I will address the parties' arguments with regard to Counts One, Two, Three, and Four, respectively. Lastly, I will turn briefly to the standing issues.

## A. *Fiduciary Duty*

■ The plaintiffs base their assertion that the Company and the bottlers have formed a fiduciary relationship on two grounds: (1) the wide scope of the relationship, which is "immeasurably broader than the mere purchase and sale of syrup"[14]; and (2) the characterization by the Company of the relationship as a "partnership." *See* Dkt. 811, at 4. The effect of this fiduciary relationship between the bottlers and the Company, according to the plaintiffs, is to create obligations between the two sides which are greater than ordinary contractual duties.[15]

---

13. This claim will be decided as if it were a bench trial on the paper record submitted by the parties.

14. 269 F. at 808.

15. In particular, the plaintiffs make the following assertions with respect to the effect of the alleged fiduciary relationship:

First, the company is prohibited from using its control over the manufacture of syrup to obtain an added profit or benefit for itself by using a cheaper sweetener in Coca–Cola syrup without the bottlers' consent, and is obligated to account for the windfall profit resulting from the savings from HFCS–55.

Second, the Company is also prohibited from using its control over the manufacture of the syrup to coerce the bottlers to abandon their claims for damages against the Company and to amend their contracts, which the Company breached when it forced the bottlers to use sugar-sweetened versions of Coca–Cola syrups knowing that it would disrupt their existing processing arrangements and cause the bottlers unnecessary expense.

Third, the Company owed the bottlers a fiduciary duty and was obligated to deal with the bottlers in the same manner as a trustee would deal with the beneficiaries of a trust. These fiduciary duties are higher than the duty of good faith and fair dealing that is implied in ordinary contracts. This means that the Company was prohibited from playing "hard ball" and not merely "foul ball" with the unamended bottlers. See *Coke V*, 668 F.Supp. at 921.

Fourth, the breach of the Company's fiduciary duties to the bottlers is more egregious than its breach of express contractual terms and the implied duty of good faith and fair dealing, and this breach is a tort for which the Company is liable to the bottlers for punitive damages.

The Court finds the plaintiffs' arguments concerning the existence of a fiduciary relationship largely unpersuasive. The first prop supporting the plaintiffs' argument falls when one considers the law concerning the creation of a fiduciary relationship in the plaintiffs' jurisdictions. For example, under California law—as the defendant correctly points out—the existence of a fiduciary relationship "arises only when the person in whom confidence is reposed acquires some control over the affairs of the other." *Walker v. KFC Corp.*, 728 F.2d 1215, 1221 n. 5 (9th Cir.1984).

■ A careful examination of the law relied upon by the plaintiffs, *see* Dkt. 811A, exh. B (collecting state law on fiduciary relationships), fails to bolster plaintiffs' argument that a fiduciary relationship exists between the Company and the bottlers. The majority of that law concerns what fiduciary duties are owed once the requisite relationship is found. That relationship does not exist here. The Company and the bottlers, although bound together by their common interest in promoting the sale of Coca–Cola, are arms-length bargaining parties, not partners.

Other authorities relied upon by the plaintiffs likewise miss the point. For example, *Arnott v. American Oil Co.*, 609 F.2d 873, 881 (8th Cir.1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980), which holds that a fiduciary relationship inheres in a franchise relationship, has been interpreted "as resting on the implied covenant of good faith and fair dealing." *Cambee's Furniture v. Doughboy Recreational, Inc.*, 825 F.2d 167, 171 (8th Cir.1987) (citing *Bain v. Champlin Petroleum Co.*, 692 F.2d 43, 47–48 (8th Cir.1982)). These ordinary implied duties are not contested by the Company. *Cam-*

*bee's* then states that "a franchise or other ordinary business relationship does not alone create fiduciary duties." *Id.* Additionally, *ABA Distributors, Inc. v. Adolph Coors Co.*, 542 F.Supp. 1272 (W.D.Mo. 1982), which relies on *Arnott*, characterizes the "fiduciary duty" between a brewer and its distributor as one of "good faith and fair dealing." *Id.* at 1286. *Accord Larese v. Creamland Dairies, Inc.*, 767 F.2d 716, 717 (10th Cir.1985).

In *Carter Equipment v. John Deere Industrial Equipment Co.*, 681 F.2d 386, 391 (5th Cir.1982), the court held that "[a] fiduciary relationship arises only if the activity of the parties goes beyond their operating on their own behalf and the activity is for the benefit of both." Because the relationship between the Company and the bottlers is both independent and interdependent, the Court is willing to assume that this necessary precondition for the finding of fiduciary relationship has been met. However, the *Carter Equipment* court proceeds to emphasize the importance of one party "repos[ing] trust or confidence in [the other]," as "critical to an ultimate determination regarding the existence of a fiduciary relationship." *Id.* *Phillips v. Chevron, U.S.A., Inc.*, 792 F.2d 521 (5th Cir.1986), in discussing *Carter Equipment*, qualifies the language in the decision concerning the requirement that neither party in a fiduciary relationship "take selfish advantage of [the other's] trust or deal ... in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith," *id.* at 524, by stating that "[t]his generalized duty of good faith and fair dealing is, however, limited by the terms of the franchise agreement." *Id.*

The plaintiffs in this case, despite their long and mutually profitable relationship

Fifth, based on this fiduciary relationship with the Company, the bottlers had trust and confidence that the Company would use market prices and not list prices of sugar to calculate the quarterly price of sugar. The Company had a duty to make full and candid disclosure to the bottlers of the method used to determine the quarterly price of Coca–Cola syrup and was prohibited from secretly changing the method without first disclosing its intentions to the bottlers and obtaining

their consent. Its failure to make such disclosure tolled the statute of limitations.

Sixth, when the settlement of the Western Sugar case resulted in a $4.3 million windfall to the Company and demonstrated that the prices which the Company used to calculate the price of syrup during 1970–74 were inflated by the refiners, the Company had an obligation to make an appropriate retroactive adjustment in the prices paid by bottlers for syrup.

with the Company, are far from reposing in it complete trust and confidence of the sort which engenders a fiduciary relationship.

By referring to the relationship between the bottlers and the Company as a "special partnership," the Company has not created a legal partnership with associated fiduciary duties. The necessary indicia of a legal partnership, or for that matter of a joint venture, for the most part are absent. These indicia include one party having a voice in the management of the other's manner of conducting business, sharing of risks, and joint control or ownership of assets. *See, e.g., Circo v. Spanish Gardens Food Manufacturing Co.*, 643 F.Supp. 51 (W.D.Mo.1985) (distributors bringing action against manufacturer for breach of constructive partnership agreement failed to establish requisite indicia of joint venture or partnership). Although through contractual provisions the Company exercises some control over the bottlers' methods of bottling the product, this control is distinct from control over management of the bottlers' affairs. Similarly, the common fortunes of the Company and the bottlers may ride to an extent on the demand for Coca-Cola, but this does not amount to risk-sharing of the requisite kind. Finally, with the possible exception of certain trademark rights, the parties do not jointly own any assets. *See Satellite Financial Planning v. First National Bank of Wilmington*, 633 F.Supp. 386, 401 & 401 n. 20 (D.Del.1986) (neither partnership nor joint venture created absent association "to carry on a business for profit as co-owners") (relying on Delaware law).

One must strain to find a resemblance between the parties' relationship and a partnership: if a faint resemblance does exist, it is far too weak to give rise to special fiduciary duties. Moreover, there is an arguable resemblance to a partnership in any franchising or manufacturer/distributor relationship. Courts in the plaintiffs' states which have addressed the question have generally found that such relationships are not fiduciary, although the conventional implied duty of good faith and fair dealing applies to these relationships. *See, e.g., Walker v. KFC Corp.*, 728 F.2d 1215, 1221 n. 5 (9th Cir.1984) (applying California law); *Mid–America National Bank v. First Savings & Loan Ass'n*, 161 Ill.App.3d 531, 113 Ill.Dec. 367, 371, 515 N.E.2d 176, 180 (1987); *W.K.T. Distributing Co. v. Sharp Electronics Corp.*, 746 F.2d 1333, 1336–67 (8th Cir.1984) (applying Minnesota law); *Bain v. Champlin Petroleum Co.*, 692 F.2d 43, 48 (8th Cir.1982) (applying Missouri law); *Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F.Supp. 1048, 1051–52 (D.Colo.1985) (applying Ohio law); *Witmer v. Exxon Corp.*, 495 Pa. 540, 434 A.2d 1222 (1981); *Picture Lake Campground, Inc. v. Holiday Inns, Inc.*, 497 F.Supp. 858 (E.D.Va.1980) (applying Virginia law); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 711 (7th Cir.) (applying Wisconsin law), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984).

Significantly, cases finding fiduciary responsibilities between, e.g., franchisors and franchisees, frequently arise in the context of a franchise termination where the franchisee has invested a considerable amount in the franchise. *See, e.g., Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736, 742 (1978) ("The weight of commentary has argued in favor of judicial recognition that the nature of a franchise agreement imposes a duty upon franchisors not to act arbitrarily in terminating the franchise agreement."); *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598, 601–02 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974), *superseded by statute, see Ricco v. Shell Oil Co.*, 180 N.J.Super. 399, 434 A.2d 1151 (1981) (inequality of bargaining power may give rise to fiduciary relationship; where landlord/franchisor attempted to terminate lease on ten days notice as provided in lease, court found violation of public policy). Moreover, the analysis in *Shell Oil* appears to turn more on contract of adhesion principles rather than on the existence of fiduciary duties. *Id.* 307 A.2d at 602 ("[T]he provisions of the lease 'and dealer agreement giving Shell the right to terminate its business relationship with Marinello, almost at will, are the result of Shell's

disproportionate bargaining position and are grossly unfair.").

In addition, the rationale underlying basic fiduciary doctrine weighs heavily against the plaintiffs' assertion that the Company owes them "duties ... that are much higher than those that apply to ordinary business contracts." Dkt. 811, at 34. Generally, courts in the plaintiffs' states limit the application of fiduciary standards to situations where "one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." *Pardue v. Bankers First Federal Savings & Loan Ass'n,* 175 Ga.App. 814, 334 S.E.2d 926, 927 (1985) (quoting Ga.Code Ann. § 23–2–58).[16]

The dominant theme of the case law cited in the margin is that fiduciary relationships arise where one party has the power and opportunity to take advantage of the other, because of that other's susceptibility or vulnerability. The vulnerability of the bottlers lies only in the greater economic strength and bargaining power of the Company. This disparity does not rise to a level where the bottlers are powerless; nor does it persuade this Court that the bottlers are equitably entitled to special protection because of their unique ties to the Company.

■ In sum, the plaintiffs' argument that the relationship between the Company and the bottlers is a fiduciary one is unpersuasive. The Court agrees, as does the Company, that the Company is under an implied duty of good faith and fair dealing. This implied duty, however, does not create the kind of strict fiduciary responsibilities alleged by the plaintiffs. Even accepting the facts as plaintiffs present them, the law simply is that no fiduciary relationship arises from such facts.

Because, as the plaintiffs concede, no award of punitive damages may be sustained in the absence of a breach of fiduciary duty beyond the implied duty of good faith and fair dealing, the Court will enter judgment in favor of the defendant with respect to the claim for punitive damages contained in Count Two.

### B. *Count One: the "Unjust Enrichment" Count*

■ Simply put, plaintiffs' theory of recovery under Count One is that the Company wrongfully continued to charge them for sucrose-sweetened syrup while providing them with HFCS-sweetened syrup. This practice, according to the plaintiffs, deprived them "of the benefits of the eco-

---

**16.** *See also Rhoads v. Harvey Publications, Inc.,* 145 Ariz. 142, 700 P.2d 840, 846 (App.1984) (where party charged with duty was "neither a relative, confidant, nor advisor ... and [the parties] operated at arm's length," no fiduciary relationship existed); *Donaldson v. Johnson,* 235 Ark. 348, 359 S.W.2d 810, 812 (1962) ("The relationship must be such as to enable the one charged with having abused it, to have exercised it to his advantage."); *Mid–America National Bank of Chicago v. First Savings & Loan Ass'n of South Holland,* 161 Ill.App.3d 531, 113 Ill.Dec. 367, 371, 515 N.E.2d 176, 180 (1987) ("slightly dominant business position" will not transform "formal, contractual relationship into a confidential or fiduciary relationship"); *Mason v. Salomon,* 62 N.M. 425, 311 P.2d 652, 654 (1957) (parties dealing at arm's length; no fiduciary relationship); *Rhodes v. Jones,* 232 N.C. 547, 61 S.E.2d 725, 726 (1950) (trust and confidence insufficient to create fiduciary duty); *Asleson v. West Branch Land Co.,* 311 N.W.2d 533, 539 (N.D.1981) (to show fiduciary duty must demonstrate relationship approximating "business agency, professional relationship, or family tie"); *Hamburg v. Doak,* 207 Okl. 517, 521, 251 P.2d 510, 514 (1952) ("confidential relation" springs from context such as kinship leading reasonable person to allow substitution of another's judgment "in material matters involved in the transaction."); *Iacometti v. Frassinelli,* 494 S.W.2d 496, 499 (Tenn.App.1973) ("confidential relationship" is one "where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party, such as nurse and invalid, trusted business adviser and friend, etc."); *O'Shea v. Coronado Transmission Co.,* 656 S.W. 2d 557, 563 (Tex.App.1983) ("To establish a fiduciary relationship, the evidence must show that ... one party is justified in relying on the other to act in his best interest."); *Consolidated Gas & Equipment Co. of America v. Thompson,* 405 S.W.2d 333, 336 (Tex.1966) (fact of trust and reliance insufficient to create constructive trust).

nomic bargain set forth in the 1921 Consent Decrees and ... their first-line Coca–Cola bottlers' contracts, which contemplated a syrup price tied to the price of the sweetening ingredient actually used." Supplemental and Amended Complaint, ¶ 52(b) (Dkt. 570). The plaintiffs allege that the refusal to "pass through" the savings to the Company from the use of HFCS constitutes a breach of the Consent Decrees and the bottlers' individual contracts.

The plaintiffs have characterized their Count One theory as an "unjust enrichment" theory, as has this Court. *See* Dkt. 570, ¶ 52(c); *Coke II*, 98 F.R.D. at 261. Indeed, the defendant contends that "[r]egardless of how Plaintiffs describe it, their theory under Count One *is* one of unjust enrichment," and cannot be viewed as anything but an unjust enrichment theory. Defendant's Reply Brief in Support of its Motion for Partial Summary Judgment, at 22 n. 13 (Dkt. 815) (emphasis original). Following from that contention, the defendant argues, is· the inescapable proposition that the plaintiffs are not entitled to recover on a theory of unjust enrichment because they are suing on an express contract. *See Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 854 (Del.Super.1980).

The plaintiffs' respond that their "unjust enrichment" theory is actually a conventional contract theory: they contend that their expectancy interest has been damaged by the Company's use of a lower-cost sweetener while charging for sugar. Under this theory, the bargain struck in 1921 contemplates pricing based roughly on the cost of the sweetener used in the syrup. The plaintiffs concede that "the existence of an express contract precludes an action in quasi-contract for unjust enrichment." Dkt. 811 at 50. However, they argue, "[t]his does not mean ... that the damages to the plaintiffs' expectation interest ... are not recoverable simply because that amount may be equal to the amount by which the Company has been unjustly enriched." *Id.*

The label plaintiffs (and the defendant and the Court) have previously placed on this argument, unjust enrichment, should not control. Rather, the Court must examine the actual argument the plaintiffs have been making to determine whether it is truly an unjust enrichment theory and therefore barred by the existence of express contracts. Viewed in this light, the plaintiffs' argument, despite the misnomer, is plainly contract-based. Therefore, the Court will tolerate the shift in terminology from "unjust enrichment" to "expectancy interest."

The defendant's second theory in support of its motion for partial summary judgment on Count One is that, even assuming a breach, the plaintiffs have not been damaged by the Company's use of HFCS–55. The plaintiffs do not contend that HFCS affects the quality of the product or its taste. They do not claim that the Company's use of HFCS has affected their sales or profits. Because they "have continued to pay a price for Coca–Cola Bottle Syrup which has been determined as provided by the pricing formula in their contracts (i.e., they have paid exactly the same price they would have paid had the Company used sucrose to sweeten Coca–Cola Bottle Syrup)," Dkt. 798 at 22–23, the Company insists that the plaintiffs have not suffered any damages to their expectancy interest.

Like the unjust enrichment argument made by the defendant, this contention is unexceptionable, provided one takes the position that the plaintiffs contracted for syrup at a price tied to changes in the price of sugar, regardless of what kind of sweetener is used. If this position is rejected, however, the defendant's "no damages" argument falls as well. Consequently, I will turn next to the question of what the pricing formula embodied in the decrees created: an expectancy interest or a pricing system focused on the plaintiffs' competitive position rather than the Company's costs. Only if the evidence shows no disputed issue of .fact concerning the plaintiffs' rights under the pricing provision will the defendant succeed in obtaining summary judgment on this point.

As noted in *Coke III*, the Court must undertake construing the Consent Decrees, which have attributes both of judgments

and contracts, by applying general contract interpretation principles.

The most fundamental principle of contract construction is to ascertain the intent of the parties. *See, e.g., Coca–Cola Bottling Co. v. The Coca–Cola Co.,* 269 F. at 804. A court should consider the agreement as a whole, putting itself in the position of the parties. The first task is to look at the express terms of the contract itself. A court may also look to other indicia of the parties' intent. These include the circumstances surrounding the making of the contract, the purpose of the parties, the course of performance under the contract, and trade usage. In applying these principles, a court must guard against inadvertently reforming a contract "under the guise of construction" by "looking too intently for means of bringing about some ultimate good, thwarting an apparent wrong, or preventing hardship...." *Coca–Cola,* 269 F. at 805.

*Coke III,* 654 F.Supp. at 1397. Applying these principles to the disputed effect of paragraph 10 leads the Court to the conclusion that, while the use of a different sweetener was obviously not contemplated by the parties in 1921, a genuine and material issue of fact exists concerning whether the decrees' pricing scheme created an expectancy interest on the bottlers' part that the price of syrup would be linked to sweetener cost, no matter what sweetener was used. In other words, now that more than sixty years have passed since the sugar-based pricing terms were agreed upon and technological advances have made fructose in the form of HFCS–55 an acceptable sweetening ingredient, should its use in syrup sold under the contracts effect a corresponding change in the pricing provision?

An equally plausible competing inference is that the bottlers insisted on receiving a high quality syrup at a verifiable price that would enable them to compete with other beverage producers and make a profit. This appears to the Court to be an inference with support in the record that conflicts (to a degree) with the plaintiffs' theories. Consequently, the inferences raise a genuine and material issue of fact.

A careful look at the Consent Decrees and the contemporaneous intent of the parent bottlers and the Company demonstrates the existence of this material issue of fact. Paragraph 10 of the decrees contains specific language concerning the content of the syrup for which the bottlers contracted that is absent from the contracts. The syrup covered by the contracts, however, probably does not differ from that described in the decrees. *See Coke V,* 668 F.Supp. at 916 ("The Court finds it is more likely the right to receive 'syrup' assigned to the unamended bottlers [in their individual contracts] includes the right to receive 'standard Bottlers Coca–Cola Syrup' under Paragraph 10 of the Consent Decrees.").

Paragraph 10, mandating that syrup shall contain at least 5.32 pounds of sugar, in combination with paragraphs 5, 6, and 7, protect the bottlers from pricing disasters like the one in which they found themselves during the pendency of the 1920 litigation. At that time, the Company had entered into long-term contracts for sugar at a price above the market price for sugar. Worsening matters, the Company insisted on price increases based upon the June 10, 1920, order of the court allowing pricing tied to the Company's manufacturing costs. At the same time the price of sugar was plummeting. By agreeing to pricing based on the Company's costs, the bottlers "quickly discovered they had unwittingly exposed themselves to and insulated the Company from the hazards of the marketplace." *Coke III,* 654 F.Supp. at 1395.

Supporting the alternative inference, the Company's unfortunate sugar purchases placed the bottlers at such a competitive disadvantage that sales of Coca–Cola decreased by 53% in September 1920 and 50% the following month. To make matters worse, in November, when "[t]he bottlers expected relief ... based on their understanding of the Company's sugar contracts," and while sugar prices continued to fall, the bottlers were met with announced price increases for syrup. *Coke III,* 654

F.Supp. at 1394. Another fact that supports the competitive pricing inference is the seven cent trigger on the pricing formula. For many years, the price of sugar never rose above seven cents per pound, and thus the pricing formula was inoperative. During that period, the Company had the benefit of the difference between the actual cost of sugar and the seven cent value.

The pricing formula developed in the wake of these events and contained in the decrees has been previously examined at some length by this Court in *Coke III* in connection with determining the meaning of the term "sugar." In *Coke III*, I stated that paragraph 10 served two major purposes: quality protection and price protection.

The Company in [paragraph 10] promises the syrup sold by it to parent bottlers will be "high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup." Quality was addressed by the requirement of "high grade standard Bottlers Coca–Cola Syrup" and the requirement of at least 5.32 pounds of sugar. The Company's theory that quality control was the sole focus of paragraph 10, however, does not withstand scrutiny. It is highly improbable that parent bottlers concerned about quality would insist on a precise minimum of "sugar" but would be wholly indifferent to what sort of "sugar" is used. Moreover, there is no reason to assume at least 5.32 pounds of a substitute "sugar" would be needed to assure high quality Bottlers Syrup.

Paragraph 10 is best explained as both a quality-control and price-protecting provision. As recounted earlier, the actual bottlers suffered financially during the period when the price of Coca–Cola Bottlers Syrup was much higher than the syrup prices paid by their competitors. In addition, both the actual bottlers and the parent bottlers were antagonistic toward and distrustful of the Company. It is against this background of hostility and distrust that the parties drafted paragraph 6 of the Consent Decrees, which states in pertinent part that:

6. In order to promote the sale of Coca–Cola and enable the actual bottlers to compete with other beverages, the party of the first part [the parents] hereby agrees to sell such syrup to the bottlers purchasing from it at not exceeding one dollar and thirty cents ($1.30) per gallon, including five cents (5¢) per gallon for advertising matter to be delivered, and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance....

The express competitive-pricing rationale recited in paragraph 6 for tying the price of syrup to the price of sugar at a six-to-one ratio is undermined if the Company can use a cheaper sweetener but continue to employ the paragraph 6 pricing mechanism. The requirement of 5.32 pounds of sugar in paragraph 10 ensures the Company cannot evade the pricing provisions of paragraphs 5, 6, and 7, and increase the effective price to the bottlers, by reducing the amount of sugar to less than 5.32 pounds or by using cheaper substitutes.

Defendant argues that so long as the strength of the syrup is maintained, (i.e., the cheaper sweetener is not an inferior sweetener), bottlers are not cheated of their bargain if the Company uses a cheaper sweetener....

The short answer to defendant's argument, and the fact to which the Court must return, is that the 1921 Consent Decrees were premised on the use of granulated cane sugar as a sweetener. In light of the experience of the parties prior to the entry of the Decrees, as well as the strong bargaining position enjoyed by the bottlers after the decision of this Court and argument before the Court of Appeals, the Court finds it unlikely they would enter into an agreement that allowed the Company to exploit a cheaper sugar in the manufacture of Coca–Cola Bottlers Syrup but keep the price of that

syrup tied to the price of granulated sugar.

Now that a fully acceptable substitute has been developed, and is being used in competing brands, it is in the interest of both the Company and the bottlers to use that substitute in place of sugar. The effect of paragraph 10's sugar requirement is to require the Company to secure the consent of the bottlers before that change is made. It is the task of the parties, not of this Court, to refashion the agreement to reflect new developments. *See Coca–Cola,* 269 F. at 805.

*Coke III,* 654 F.Supp. at 1401–03 (footnotes and citations omitted).[17]

The question not reached in *Coke III* is whether the plaintiffs are correct in maintaining that the dual function of paragraph 10 supports their claim to an expectancy interest in syrup tied to sweetener cost. The defendant argues plaintiffs have no expectancy interest in syrup priced according to the sweetener used. The Company focuses its arguments on the uncontroverted facts that the plaintiffs have not paid more for syrup than they would have had sugar-sweetened syrup been used rather than HFCS, that their sales have not been adversely affected, and that the switch to HFCS did not increase the plaintiffs' operating costs. The fulcrum of the defendant's argument is the basic maxim of contract law that damages are measured by the injured party's loss, not the breaching party's gain. *See Acme Mills & Elevator Co. v. Johnson,* 141 Ky. 718, 133 S.W. 784 (1911); *see also Madison Fund, Inc. v. Charter Co.,* 427 F.Supp. 597, 608 (S.D.N.Y.1977) (party injured by breach limited to damages caused by breach, not entitled to "position better than that which he would have occupied had the contract been performed").

The Court agrees that the plaintiffs cannot recover damages which put them in a better position than they would have enjoyed if no breach occurred. Therefore, the defendant argues, because the plaintiffs would have paid the same amount if the defendant had never used HFCS in the syrup, they cannot recover the alleged overcharges from the sale of HFCS–sweetened syrup at sugar-based prices. The defendant relies in part on several construction contract cases involving substitution of materials for those called for under the contract. *See Jacobs & Youngs, Inc. v. Kent,* 230 N.Y. 239, 129 N.E. 889 (1921); *De Sombre v. Bickel,* 18 Wis.2d 390, 118 N.W.2d 868, 871 (1963).

The plaintiffs retort that they have a contractually-protected expectation that the syrup they buy will be priced according to the sweetener actually used. Consequently, they argue that they have been damaged by the Company's sale of syrup with HFCS at sugar-based prices in the amount of the difference in the average market price of the two sweeteners. The use of an ingredient that is "just as good" is not an option under the contract, according to the plaintiffs. Also relying on construction cases, the plaintiffs maintain that the law actually favors their position rather than the Company's position.

Thus, to resolve the dilemma on the parties' terms, the Court would have to examine (1) whether the contracts were nonetheless substantially performed; (2) if so, whether the substitution of HFCS constitutes a breach; (3) if a breach occurred, whether the breach was purposeful or inadvertent; and (4) if inadvertent, whether the cost of "repairing" the breach amounts to economic waste. To engage in such an inquiry strikes the Court as senseless.[18]

---

**17.** Unfortunately, the parties have been unable, and perhaps unwilling, to fashion a new agreement to meet the changed business of producing and bottling Coca–Cola. Rather, the Company has taken the position that the bottlers must take sucrose-sweetened syrups, although sucrose is more expensive to the Company, or else amend their contracts and agree to price increases.

**18.** Here, "repair" is impossible. The subject matter of the contracts has been consumed. There is no permanent structure built substantially to specifications, which might provide the basis for determining whether tearing out non-conforming pipe and replacing it with pipe conforming to the contract would involve unnecessary economic waste. The construction cases provide some analytical aid, but do not set forth a particularly firm analytical foundation.

In the Court's view, the essential issues with respect to Count One are whether the current circumstances in which the parties find themselves are within the contractual penumbrae governing their relations. These issues are not conducive to resolution upon summary judgment. They revolve around the plaintiffs' perpetual right to receive a syrup at a price tied to an ingredient which may have become technologically obsolete. What is known about this right is that at one time it included, at the least, the right to receive sugar-sweetened syrup. However, the plaintiffs' right to receive sugar-sweetened syrup, based on the decrees, contracts, and the Company's course of performance prior to 1980, does not establish their right to receive damages for alleged overcharges due to the Company's use of HFCS.

Another factor relevant to the disputed scope of the plaintiffs' rights is the express goal of the Consent Decrees to preserve the bottlers' competitive position. It seems apparent that the contracts and decrees were based on the assumption that all bottlers would thereafter be governed by substantially identical contracts, and that tying the contract price to changes in the price of sugar would protect the bottlers' ability to compete with other beverage producers. Now that the unamended bottlers enjoy the more favorable prices set under the decrees while the majority of the bottlers operate under contracts with pricing provisions developed in 1978 and still compete effectively with other soft drink bottlers, the rationale for the sugar price protection diminishes.

Like the meaning of "sugar," *see Coke III*, 654 F.Supp. at 1398, the question of the parties' intent with respect to pricing of syrup made with a substitute sweetener is ambiguous; it is not a question which may be determined by confining attention to the four corners of the Consent Decrees and the corresponding contracts. A proper interpretation of the Consent Decrees and contracts, and whether the plaintiffs' Count One claims are meritorious, must give consideration to extrinsic evidence. Therefore, factual disputes and conflicting plausible inferences prevent grant of the defendant's motion for summary judgment on Count One. *See Fox v. United States Department of Housing and Urban Development*, 680 F.2d 315, 319 (3d Cir.1982) (when contract ambiguous, extrinsic evidence necessary to discern meaning, making question one of fact rather than of law).

The defendant's motion for summary judgment on Count One is denied.

## C. Count Two: the "Standard Syrup" Count

In 1987, the Court allowed the plaintiffs to amend their complaint to "clarify the relief requested" in original Count One by dropping their request that the Court order the Company to provide them with sucrose-sweetened syrup and restrict their requested relief to recovery of the savings to the Company from the use of HFCS. The plaintiffs also added a request for an injunction directing the Company to supply them with concentrate, which is syrup without sweetener, and which the Company now provides to amended bottlers. *See Coke V*, 668 F.Supp. at 922.

The defendant opposed the plaintiffs' motion to amend on the ground that "the plaintiffs should be foreclosed under the doctrine of 'judicial estoppel' from bringing the supplemental claim," because it conflicted with "the plaintiffs' original allegation of breach based on the substitution of HFCS-55 for sugar in 1980." *Id.* at 923. This Court distinguished between the plaintiffs' claim of breach based on the unauthorized substitution of HFCS and their claim arising from the "standard" syrup provision. *Id.* The former claim relates to the pricing of syrup, while the latter relates to the syrup's composition. It is true that to harmonize the two claims requires tracing a rather winding course: the Company's substitution of HFCS for sugar without the bottlers' consent while charging for sugar-sweetened syrup constituted a breach of the decrees and contracts, but once supplying HFCS-sweetened syrup became the near-uniform practice of the Company, forcing the unamended bottlers to accept sugar-sweetened syrup, previously de-

scribed by this Court as "an express duty imposed on the Company," *Coke V*, 668 F.Supp. at 916, became a breach of the Company's duty to provide "standard" syrup to the bottlers.

The Company urges the Court to formally adopt its preliminary conclusions of *Coke V* with regard to the validity of the plaintiffs' "standard syrup" argument. In support of its argument that the Court should adhere to the tentative conclusions of *Coke V*, the Company declares that "[s]ince the Court's decision in *Coke V*, discovery has disclosed absolutely no additional evidence which would support Plaintiffs' argument under Count Two." Dkt. 798 at 33. Rather than presenting a "clear legal issue," *id.*, in the Court's view the plaintiffs' standard syrup argument raises a factual dispute concerning whether the term "standard" may be read to impose a duty on the Company to provide a uniform syrup to each bottler. The parties have not fully addressed the question of whether there can even be a "standard" syrup in light of the proliferation of end products, the technological advances in sweeteners, and the use of concentrate in place of sweetened syrup.

The Company asserts that "Standard Bottlers' Coca–Cola Syrup" includes sucrose-sweetened syrup, and that the Company's supplying of the unamended bottlers with such syrup cannot be a breach of the decrees or the contracts. The Company finds support in this Court's previous opinions touching on the subject. *See Coke V*, 668 F.Supp. at 916; *Coke III*, 654 F.Supp. at 1406. The conclusions reached in earlier stages of this litigation, however, do not control the Court's analysis when the facts giving rise to plaintiffs' claims have been developing almost simultaneously with the litigation. Additionally, there is a subtle but important distinction between the Company's alleged breach of the contracts and decrees through refusing to pass-through savings, and the alleged breach by the Company of the standard syrup provision, a distinction disregarded by the Company.

Although the Court rejected the plaintiffs' arguments concerning the meaning of standard Coca–Cola Bottlers' Syrup in *Coke V*, 668 F.Supp. at 917, there were deliberate qualifications on that rejection.[19] Taking a fresh look at the standard syrup dispute, with the benefit of hindsight, the Court finds the plaintiffs' arguments stronger than initially thought and sufficient to raise issues preventing summary judgment. The major issue raised is whether sugar, or more particularly, sucrose, is a defining characteristic of Coca–Cola Bottlers' Syrup under the contracts as of 1988. This issue turns on the parties' intent and thus raises a question of fact. *See Diet Coke II*, 637 F.Supp. at 1225–26.

The plaintiffs argue that Coca–Cola Bottlers' Syrup must be defined separately from the ingredient used to sweeten it. The Court's previous statements on the question of the meaning of sugar under the contracts and decrees are by no means fatal to the plaintiffs' argument that Coca–Cola Bottlers' Syrup may be, and in light of the Company's utilization of HFCS must be, defined separately from whatever ingredient is used to sweeten it. Albeit supported by this Court's prior statements, the Company's position extends further to the assertion that the sweetener used defines whether a product falls within the scope of the term Coca–Cola Bottlers' Syrup. The Court's previous rulings have not swept this far. Instead, they have centered on the meaning of terms used in the decrees, and have not fully explored the plaintiffs' rights under their contracts, or have dealt in the preliminary injunction context with plaintiffs' probable contractual rights in connection with a finding of no irreparable injury. *See Coke III*, 654 F.Supp. at 1418 (holding that the term sugar as used in the decrees did not include HFCS); *Coke IV*, 654 F.Supp. at 1445 ("The Court takes no position in this Opinion on the effect the subsequent contracts entered into by the first-line bottlers and the parents, and the

---

**19.** The context of *Coke V*, i.e., decision on a preliminary injunction motion, caused the Court to stop short of fully rejecting the plaintiffs' arguments. *See, e.g., Coke V*, 668 F.Supp. at 917 (plaintiffs' argument "not likely to succeed" in light of decrees' terms).

parties' course of performance under those contracts, will have in proving a breach of the Consent Decrees."); *Coke V*, 668 F.Supp. at 916 (rights assigned to the bottlers under the decrees include "contents agreed to" in the decrees).

The Company now asks the Court to hold that Coca–Cola Bottlers' Syrup is defined by one of its ingredients, i.e., that Coca–Cola Bottlers' Syrup means Coca–Cola Bottlers' Syrup sweetened with sugar. Although the Court agrees that its previous holdings have established that the 1921 Consent Decrees, and through assignment, the bottlers' individual contracts, originally required the Company to provide the bottlers with syrup sweetened with sucrose at a price based on sucrose, that determination is distinct from holding that standard Coca–Cola Bottlers' Syrup cannot now include HFCS–sweetened syrup.

Given the determination that the plaintiffs' contentions concerning the proper definition of Coca–Cola Bottlers' Syrup raise triable issues of fact, there is no pressing need to reevaluate the parties' arguments with respect to whether the Company's provision of sucrose-sweetened syrup may constitute a breach of the implied duty of good faith and fair dealing. The Court's previous assessment of plaintiffs' claim on this point as weak, *see Coke V*, 668 F.Supp. at 921, will stand. The possibility of an evolving definition of what constitutes standard syrup which would prevent the Company from forcing unamended bottlers to accept sucrose-sweetened syrup does not rise to the level at which the Company's decision in this regard could be viewed as a breach of the implied duty of good faith and fair dealing.

Only in a contractual relationship as complicated as the one now before the Court could a party be instructed that what once it was required to do it may not now do. However, the factors which underlie this possible reversal of duties are in large part business decisions by the Company. These decisions do not fit precisely within the contours of the ancient contracts operative here. But the lack of unambiguous fit does not automatically entitle the Company

to escape from the perpetual nature of the contracts by arguing that business realities have rendered the plaintiffs' contracts obsolete. If there is a reasonable way of upholding the contracts despite the changes in the business, the Court must give consideration to it.

The Company's motion for summary judgment on Count Two of the plaintiffs' amended and supplemental complaint is denied.

### D. *Count Three: the Market Price Count*

Count Three of the plaintiffs' complaint alleges that the Company has miscalculated the market price of sugar under the contracts by using official list prices rather than lower actual prices made known by sugar refiners to purchasers. In *Coke III*, the Court found that "market price" as used in the decrees meant:

> an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale, but not including a standard two percent cash discount or any individually negotiated discounts, allowances, or rebates.

*Coke III*, 654 F.Supp. at 1418.

The market price provision only became operative when the price of sugar rose above seven cents per pound. The price of sugar hovered around two or three cents per pound from a few years after the entry of the decrees until the early 1940's. The market price determination thus did not activate after 1924 until late in 1940's. During the first years of the decrees, the parent bottlers and the Company disagreed over whether the syrup price should be calculated based on the actual selling price of sugar or the higher official list price. Those differences were never definitively

resolved because sugar remained below seven cents per pound. After World War II, when the market price provision again became relevant, the Company followed a policy, known to the bottlers, of using the list price as a ceiling, but utilizing the lower actual selling price where ascertainable.

> In ascertaining whether a refiner is selling below its "list" or "quoted" price, the Company has traditionally made direct inquiry of the refiner. There is no evidence that the Company asked the refiner whether this lower selling price was available to all industrial users of sugar, however. Rather, it appears the Company has used the greatest discount, rebate, or allowance available. The only criterion for whether the Company would use a particular selling price is whether the refiner would represent to the Company that sugar was being sold at that price.

*Coke III*, 654 F.Supp. at 1418.

In 1969, the Company's procedure for calculating market price changed from "an independent investigation into the 'market price,'" *id.* at 1416, to the use of official list prices. The plaintiffs must still prove that the Company in fact deviated from the directive to use market price, however. In particular, the plaintiffs must bring forward evidence that lower prices than those used by the Company for each of the quarters since the change in procedure were available upon inquiry. The Company believes that even if the plaintiffs have evidence sufficient to meet their burden, they are barred, either completely or partially, from pursuing their claim under this count by the applicable statutes of limitations.

The first question presented on this count is which statute of limitations applies to the plaintiffs' market price claims. The parties agree that the Delaware borrowing statute, Del.Code Ann. tit. 10, § 8121 (1975), applies to the bottlers' contract claims for these purposes.[20] The borrowing statute dictates use of the shorter of (1) the applicable Delaware statute of limitations, or (2) "the time limited by the law of the state ... where the cause of action arose." *Id.* The defendant argues that applying the borrowing statute results in the choice of Delaware's Uniform Commercial Code (U.C.C.) statute of limitations, Del.Code Ann., tit. 6, § 2–725(1) (1975), which limits actions "for breach of any contract for sale" to within four years of accrual. The plaintiffs protest that the applicable limitations period for the purposes of the borrowing statute is twenty years, the period governing contracts under seal. *See Federal Deposit Ins. Corp. v. Hinkson*, 665 F.Supp. 356, 357 (D.Del. 1987) (relying on *Di Biase v. A & D, Inc.*, 351 A.2d 865, 867 (Del.Super.1976); *Garber v. Whittaker*, 23 Del.Ch. 45, 2 A.2d 85 (1938)). The parties do agree, however, that in the event the U.C.C. statute applies, it applies to all plaintiffs, because it is as short or shorter than the comparable statutes in plaintiffs' states.

The Company bases its argument on three grounds:

1. Plaintiffs' claims under their first-line bottling contracts are subject to the shorter of (a) the four-year statute of limitations of the Delaware Uniform Commercial Code or (b) the statute of limitations of the respective states in which their causes of action arose. Since none of the latter are shorter than the four year Delaware statute, the applicable limitations period for all Plaintiffs is four years.

2. At a minimum, Plaintiffs are barred from recovering damages for any period beyond the period beginning four years before the filing of their Complaints.

3. Because Plaintiffs' claims under Count Three allege a consistent and uniform misapplication of the pricing formula beginning in 1969, the statute of limitations in fact began to run in 1969.

---

**20.** Although the Court previously has held that Delaware law governs the bottlers' claims under the Consent Decrees, *Coke II*, 98 F.R.D. at 269, due to the resolution of the bottlers' motion to intervene and the Court's ruling on the defendant's summary judgment motion as to standing, the issue of the proper statute of limitations applicable to the Consent Decrees will not be addressed.

Therefore, Plaintiffs' claims under Count Three are barred in their entirety.

Dkt. 798, at 46.

Previously the Court has held that the bottlers whose contracts predate the enactment of the U.C.C. were not governed by it. *See Coke II*, 98 F.R.D. at 266 n. 29. This holding was not made, however, in the context of determining whether the U.C.C. might apply to bar causes of action arising subsequent to its enactment on contracts entered into before its enactment, as the defendant now contends. Therefore it does not necessarily control the present question. Additionally, there are at least three bottlers [21] whose contracts date from after 1967, when Delaware enacted the U.C.C. The dates of their contracts, according to the Company, prevent them from sidestepping the application of § 2–725 by arguing, as the other bottlers do, that their contracts are not governed by retroactive application of the U.C.C. Because the plaintiffs argue that their contracts are outside the coverage of the U.C.C. in any case, though, the strength of that argument could direct the outcome for both pre–U.C.C. and post–U.C.C. bottlers.

The statute of limitations inquiry ordinarily would follow this course: (1) are the plaintiffs' contracts, both before and after 1967, outside the scope of the U.C.C.?; (2) if not, should the U.C.C. statute of limitations apply retroactively to bottlers whose contracts were executed prior to 1967?; and (3) if the four year statute does apply, did the plaintiffs' claims accrue in 1969 so that they are completely barred? However, the resolution of the first question renders reaching the second and third questions unnecessary.

U.C.C. § 2–102 states that article 2 applies to "transactions in goods" only. Del.Code Ann. tit. 6, § 2–102 (1975). The contracts between the Company and the bottlers certainly involve more than the ordinary sale of goods contemplated by the U.C.C. However, that law might still apply if the contracts are primarily for the sale of goods. *See Glover School and Office Equipment Co. v. Dave Hall, Inc.*, 372 A.2d 221, 223 (Del.Super.1977) ("Where a mixed contract [for goods and services] is involved, it is necessary that the Court review the factual circumstances surrounding the negotiation, formation and contemplated performance of the contract to determine whether the contract is predominantly or primarily a contract for sale of goods of for services.").

Judge Morris faced a very similar question under the 1899 contracts in *Coke 1920*, 269 F. at 808:

What was the paramount purpose of the contract, as ascertained from the agreement as a whole? In my opinion it was the establishment of the business of bottling the Coca–Cola drink.... A contract merely for the purchase and sale of syrup would not be a repository for covenants making obligatory on the part of the purchaser the establishment of bottling plants having a capacity sufficient to supply the greater part of the nation and restricting the resale of the syrup, "except after it is carbonated and bottled"; nor would it be a repository for a grant of the sole and exclusive right to use the trade-mark of the vendor, not upon the syrup, but upon the product of those bottling plants.

I find nothing in the contract or the circumstances attending its making to indicate that these covenants are subordinate or incidental to the covenant for the purchase and sale of syrup. On the other hand, the contract and the surrounding circumstances show that such covenants and the covenants to purchase and sell syrup are co-ordinate and of equal rank. A contract so constituted shows an essential object and purpose immeasurably broader than the mere purchase and sale of syrup. Its real purpose neither lies in nor is revealed by any single covenant or provision;, but is evinced by the result obtained by combining all the covenants. That result is the

---

**21.** Sacramento Coca–Cola Bottling Company, The Cleveland Coca–Cola Bottling Company, and Love Bottling Co.

sale and purchase of a potential business and the establishment of an actual business. This result is the whole, of which each covenant is merely a part. To this whole each covenant, when separately considered, is ancillary and incidental. . . .

*Id.*

The Court finds Judge Morris's reasoning on this question persuasive. The contracts impose obligations on both sides that are different in kind from the traditional sales contract contemplated by the U.C.C. As Judge Morris found, the balance between the "goods" and "non-goods" portions of the contracts is even: neither the sales aspects nor the other aspects of the contracts predominate. *See id.*

The defendant predicates its arguments on the classification of the parties' contractual relationship as fundamentally a transaction in sales, claiming that the plaintiffs have asserted that the U.C.C. applies in previous briefing, *see* Dkt. 675 at 24, 30, and that the Court previously has so held. *See Coke V*, 668 F.Supp. at 918 (stating that two bottlers had U.C.C.–governed contracts). Neither the plaintiffs' reliance on U.C.C. cases to support their implied duty of good faith and fair dealing argument, nor the Court's statement in *Coke V* in connection with the same subject, however, were dependent on an explicit finding that the U.C.C. governs the bottlers' contracts.

It is true that in many cases involving franchises, distributorships, or other "mixed" goods and services contracts, courts have found these contracts within the U.C.C. *See Sally Beauty Co. v. Nexxus Products Co.*, 801 F.2d 1001, 1005 (7th Cir.1986) ("[T]he rule in the majority of jurisdictions is that distributorships (both exclusive and non-exclusive) are to be treated as sale of goods contracts under the UCC.") (citing cases from, inter alia, Kentucky, Pennsylvania, and California); *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir.1974); *Warner Motors, Inc. v. Chrysler Motors Corp.*, 5 U.C.C. Rep. (Callaghan) 365 (E.D. Pa.1968). Other cases, however, have taken the opposite position, holding that the importance of the service aspects of some

mixed contracts places them outside the scope of Article 2. *See, e.g., Wagstaff v. Protective Apparel Corp.*, 760 F.2d 1074, 1076–77 (10th Cir.1985) (distributorship agreement not within U.C.C.) (applying Oklahoma law); *Wells v. 10–X Manufacturing Co.*, 609 F.2d 248, 254 (6th Cir.1979) ("[T]he fact that the party supplying a service does so in conjunction with the delivery of goods does not necessarily mean that the transaction comes within the [U.C.C.]."); *see also Tele–Radio Systems Ltd. v. De Forest Electronics, Inc.*, 92 F.R.D. 371, 374 (D.N.J.1981) (genuine issue of material fact prevented summary judgment on application of U.C.C. § 2–725 to alleged breach of franchise agreement).

The Court concludes that the determination of whether a mixed contract falls within the U.C.C. depends heavily on the facts and terms peculiar to that contract. Here the contracts involved are ancient, perpetual, and involve divisions of trademark rights, shared advertising, and the transfer of "the business of bottling." *See Coca–Cola Bottling Co.*, 269 F. at 808. These factors establish a service orientation of the contracts that is much more than "merely incidental or collateral to the sale of goods." *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 743 (2d Cir. 1979) (quoting *Dynamics Corp. of America v. International Harvester Co.*, 429 F.Supp. 341, 347 (S.D.N.Y.1977)).

In reaching this conclusion, the Court is mindful of the principle that the "scope of coverage of 'goods' is not to be given a narrow construction but instead should be viewed as being broad in scope so as to carry out the underlying purpose of the Code of achieving uniformity in commercial transactions." *Pittsburgh—Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 580 (7th Cir.1976). Indeed, it would be disingenuous to contend that the subject contracts do not involve the sale of "goods" within the meaning of U.C.C. § 2–102. Nevertheless, the importance of the non-sales aspects of the contracts mandates the conclusion that the contracts fall outside the coverage of the U.C.C.

Having determined that the U.C.C. statute of limitations does not apply, the inquiry becomes which statute does control. With respect to the contract claims, the plaintiffs submit that the appropriate statute of limitations period is either twenty years, the time period applicable to contracts under seal in Delaware, *see Federal Deposit Ins. Corp. v. Hinkson*, 665 F.Supp. 356 (D.Del.1987), or the time period applicable to contracts under seal in the plaintiffs' home states, where that period is shorter than twenty years. Although the Company initially disputed the validity of the seal on the contracts, *see* Dkt. 815 at 30–31, at oral argument on May 4, 1988, counsel for the Company conceded that the contracts were executed under seal. *See* Transcript of Hearing, at 198–99 (Dkt. 433). The Company also has stated that in the event the Court found, as it has, that § 2–725 of the U.C.C. did not apply to the plaintiffs' claims, then the applicable statutes would be those listed by the plaintiffs in Dkt.

811A, App. F, with the exception of the Wisconsin statute.

■ The Wisconsin statute listed by the plaintiffs is Wisc. Stat. § 893.50, a ten-year period. The defendant disputes the application of this statute to the Wisconsin plaintiff, arguing that § 893.43, a six-year statute, controls. It appears that the Wisconsin courts would apply the six-year statute, which covers "any contract, obligation, or liability, expressed or implied," § 893.43, rather than the ten-year statute, which is expressly subject to more specific provisions.

■ With the exception of Pennsylvania, which also applies a twenty-year limitations period to contracts under seal, the statutes in plaintiffs' home states provide limitations periods shorter than Delaware's twenty-year period. The specific time periods applicable to each plaintiffs' contract claims are listed in the margin.[22]

22. Elizabethtown Plaintiffs (Complaint Filed 2/4/81):

The Coca–Cola Bottling Company of Tucson (Arizona), Ariz.Rev.Stat. § 12–548 (6 years), damages recoverable from 2/4/75;

Magnolia Coca–Cola Bottling Company, Inc. (Arkansas), Ark.Stat. § 16–56–111 (5 years), damages recoverable from 2/4/76;

Sacramento Coca–Cola Bottling Company (California), C.C.P. § 337 (4 years), damages recoverable from 2/4/77;

Streator Coca–Cola Bottling Company (Illinois), Ill.Stat. § 110–13–206 (10 years), damages recoverable from 2/4/71;

Coca–Cola Bottling Company of Elizabethtown, Inc./Owensboro Coca–Cola Bottling Company (Kentucky), Ky.Rev.Stat. § 413.090 (15 years), damages recoverable from 2/4/66;

Coca–Cola Bottling Company of Shelbyville, Inc. (Kentucky), Key.Rev.Stat. § 413.090 (15 years), damages recoverable from 2/4/66;

[Alexandria] Coca–Cola Bottling Company, Inc. (Minnesota), Minn.Stat. § 541.05 (6 years) damages recoverable from 2/4/75;

Natchez Coca–Cola Bottling Company, Inc. (Mississippi), Miss.Code § 15–1–49 (6 years), damages recoverable from 2/4/75;

Jefferson City Coca–Cola Bottling Company (Missouri), Mo.Stat.Ann. § 516.120 (5 years), damages recoverable from 2/4/76;

Trenton Coca–Cola Bottling Company (Missouri), Mo.Stat.Ann. § 516.120 (5 years), damages recoverable from 2/4/76;

Macon Coca–Cola Bottling Company (Missouri), Mo.Ann.Stat. § 516.120 (5 years) damages recoverable from 2/4/76;

Deming Coca–Cola Bottling Company (New Mexico), N.M.Stat.Ann. § 37–1–3 (6 years), damages recoverable from 2/4/75;

Las Cruces Coca–Cola Bottling Company (New Mexico), N.M.Stat.Ann. § 37–1–3 (6 years), damages recoverable from 2/4/75;

Wilmington Coca–Cola Bottling Works, Inc./New Bern Coca–Cola Bottling Company (North Carolina), N.C.Gen.Stat. § 1–47 (10 years), damages recoverable from 2/4/71;

Kelford Coca–Cola Bottling Company (North Carolina), N.C.Gen.Stat. § 1–47 (10 years), damages recoverable from 2/4/71;

Plymouth Coca–Cola Bottling Company (North Carolina), N.C.Gen.Stat. § 1–47 (10 years), damages recoverable from 2/4/71;

[Williston] Coca–Cola Bottling Company (North Dakota), N.D.Cent.Code Ann. § 28–01–16 (6 years), damages recoverable from 2/4/75;

Coca–Cola Bottling Company of Dickinson (North Dakota), N.D.Cent.Code Ann. § 28–01–16 (6 years), damages recoverable from 2/4/75;

Coca–Cola Bottling Company of Jamestown (North Dakota), N.D.Cent.Code Ann. § 28–01–16 (6 years), damages recoverable from 2/4/75;

Cleveland Coca–Cola Bottling Company, Inc. (Ohio), Ohio Rev.Code Ann. § 2305.06 (15 years), damages recoverable from 2/4/66;

Coca–Cola Bottling Company of Tulsa (Oklahoma), Okla.Stat.Tit. 12 § 95 (5 years), damages recoverable from 2/4/76;

CCBC of LeHigh Valley (Pennsylvania), Pa. Cons.Stat.Ann. § 42–5529 (1981) (20 years), damages recoverable from 2/4/61;

[San Angelo] Coca–Cola Bottling Company (Texas), Tex.Civ.Prac. & Rem.Code Ann.

■ There is one final matter relating to the statutes of limitations [23] that requires attention. The defendant asserts that the plaintiffs' causes of action accrued in 1969, when the Company apparently changed its practice of calculating syrup prices, because the "alleged overcharges resulted from the same repeated method of miscalculation." Dkt. 798 at 55. (emphasis in original). The plaintiffs respond that the general rule applicable to installment contracts is that separate causes of action accrue with each required performance.

The Court finds the authorities holding that installment contract claims accrue at the time the particular performance is due more persuasive. *See, e.g.,* 51 Am.Jur.2d § 133 (1970 & Supp.1987). The cases relied upon by the defendant, which concern actions under the Economic Stabilization Act, 12 U.S.C.A. § 1904 note (1980), and the Emergency Petroleum Allocation Act, 15 U.S.C. § 754(a)(1) (1982) turn largely on their own facts. For example, *CPI Crude, Inc. v. Coffman,* 776 F.2d 1546 (Temp. Emer.Ct.App.1985), rests its conclusion that each overcharge for crude oil does not constitute a separate cause of action partially on the plaintiff's knowledge of the conditions giving rise to the overcharge. *See id.* at 1553. Similarly, *Western Mountain Oil, Inc. v. Gulf Oil Corp.,* 726 F.2d 765 (Temp.Emer.Ct.App.1983) (applying federal law), found that the plaintiff's cause of action accrued when its supplier misclassified the plaintiff, resulting in continuing overcharges for petroleum products. The court determined that the "conduct resulting in injury to [the plaintiff] was this improper classification." *Id.* at 768. Accordingly, the court rejected the plaintiff's "continuing violation" theory. Here, unlike in *Western Mountain Oil,* the Company had a recurring duty to determine the market price of sugar of the ten largest domestic refineries during a specified period of each quarter. Hence, the Court finds *Western Mountain* and *CPI Crude* distinguishable from the instant case.

For the reasons given above, the defendant's motion for summary judgment with respect to Count Three is denied.

### E. *Count Four: the Western Sugar Count*

The plaintiffs' Count Four theory consists of an equitable claim to a portion of the Company's recovery of some $4.3 million as a result of the settlement of antitrust litigation involving the sugar industry. The parties have agreed that this issue is ripe for decision as if it were a trial on a paper record. Transcript of Hearing, May 4, 1988, at 18–19, 24–25 (Dkt. 433). Accordingly, this portion of the opinion will constitute the Court's findings of fact and conclusions of law with respect to the plaintiffs' claims under Count Four.

### 1. Findings of Fact

In 1974, the United States brought criminal and civil antitrust actions against sever-

§ 16.004 (4 years), damages recoverable from 2/4/77;

Marshall Coca–Cola Bottling Company (Texas), Tex.Civ.Prac. & Rem.Code Ann. § 16.004 (4 years), damages recoverable from 2/4/77;

Laredo Coca–Cola Bottling Company (Texas), Tex.Civil Prac.Rem. & Code Ann. § 16.004 (4 years), damages recoverable from 2/4/77;

Coca–Cola Bottling Company of Brownsville (Texas), Tex.Civ.Prac. & Rem.Code § 16.004 (4 years), damages recoverable from 2/4/77;

Central Coca–Cola Bottling Company (Virginia), Va.Code Ann. § 8.01–246(2) (5 years), damages recoverable from 2/4/76;

*LaCrosse Plaintiffs* (Complaint Filed 7/24/87):

Arkansas–Ga. Co. (Arkansas), Ark. Stat. § 16–56–111 (5 years), damages recoverable from 7/24/82;

Love Coca–Cola Bottling Company (Oklahoma), Okla.Stat. Tit. 12 § 95 (5 years), damages recoverable from 7/24/82;

LaCrosse Coca–Cola Bottling Company (Wisconsin), Wisc.Stat. § 893–43 (6 years), damages recoverable from 7/24/81.

**23.** The plaintiffs have argued that in the event the Court accepts the defendant's assertion concerning the accrual of the market price claim in 1969, the statutes of limitations should be equitably tolled due to the Company's fraudulent concealment of its change in policy or its failure to disclose that change. See Transcript of Hearing, May 4, 1988, at 211. Given the above disposition, the Court will not reach that issue.

al sugar producers. *See In Re Sugar Industry Antitrust Litigation*, 395 F.Supp. 1271, 1271 (J.P.M.L.1975). The criminal actions resulted in convictions on pleas of nolo contendere. Appendix D to Brief of Defendant The Coca–Cola Company in Support of its Motion for Partial Summary Judgment, Tabs 1-2 (Dkt. 798D). The civil actions were resolved through consent decrees. *See United States v. Great Western Sugar Co.*, 1978–2 Trade Cas. (CCH) ¶ 62,235 (N.D.Cal.) [available on WESTLAW, 1978 WL 1399]; *United States v. California & Hawaiian Sugar Co.*, 1978–2 Trade Cas. (CCH) ¶ 62,236 (N.D.Cal.) [available on WESTLAW, 1978 WL 1400]; *United States v. Utah–Idaho Sugar Co.*, 1978–2 Trade Cas. (CCH) ¶ 62,237 (N.D.Cal.) [available on WESTLAW, 1978 WL 1401].

Several civil antitrust actions filed by private plaintiffs followed the resolution of the government's cases. The Judicial Panel on Multidistrict Litigation consolidated the civil suits, which were subsequently certified as class actions under Federal Rule of Civil Procedure 23. One of the classes of sugar purchasers was an "industrial user" class to which the Company belonged. *In re Sugar Industry Antitrust Litigation*, 1977–1 Trade Cas. (CCH) ¶ 61,373 (N.D.Cal.1976) (*"Western Sugar"*) [available on WESTLAW, 1976 WL 1374]. The defendant sugar producers in *Western Sugar*—several beet processors, two sugar refiners, the National Sugarbeet Growers Federation, and the California Beet Growers Association—settled the case with the plaintiff class for approximately $60 million. The court overseeing the settlement approved it after notice in compliance with Rule 23(e) was given. *See* App. D, Table of Contents (Dkt. 798D); Supplemental Complaint ¶ 81 (Dkt. 570).

While the private class actions were pending, the bottlers' association formally requested the Company to "pass through ... on a pro rata basis any monies that may be received by the Company by reason of the fact that the Company may ... become ... a class plaintiff in current litigation concerning alleged antitrust violations with respect to the sale of refined sugar...." Dkt. 811A, exh. I, at BY1123

(letter of May 3, 1977, from John S. Knox, Jr., Executive Director of the Coca–Cola Bottlers' Association, to John H. Ogden, President of Coca–Cola USA). Ogden replied to Knox that "the Company has decided that it would not be feasible to attempt to pass through to the bottlers recoveries" from the *Western Sugar* litigation. *Id.* at BY1073 (letter of July 11, 1977, from Ogden to Knox).

The bottlers' claim for the pass-through springs from the pricing mechanism contained in the decrees, *see* paragraphs 5–7 of the decrees, and incorporated in the contracts, *see* Appendix C to Defendant's Brief in Support of Motion for Partial Summary Judgment, Tab 1, ¶ FOURTH(d) (Elizabethtown Bottler's Contract) (Dkt. 798C), setting the price of syrup at $1.30 plus 6¢ multiplied by the number of cents by which the market price (per pound) of sugar exceeds 7¢. Thus, the "market price" of sugar, as calculated under the decrees and contracts, is the variable that determines what the bottlers pay for syrup under their unamended contracts.

It is undisputed that the Company uses some of the sugar it purchases in fountain syrup, some in bottle syrup, and some in other products. *See* Dkt. 798, at 64–65. It is also undisputed that the Company sold approximately forty million gallons of syrup per quarter to all bottlers during the relevant time period. *See* Dkt. 811A, exh. I, at BY1142 (memorandum of May 27, 1977, from Frank Wanning of the Company's Purchasing Department to John H. Ogden, President of Coca–Cola USA) ("Wanning memorandum").

### 2. Conclusions of Law

 The plaintiffs' amended complaint seeks recovery of the amounts the Company received as part of the *Western Sugar* settlement, charging that

Because The Coca–Cola Company used the published list prices of the *Western Sugar* defendants to compute the price at which it sold Coca–Cola Bottlers' Syrup ... during 1970–74, when The Coca–Cola Company received a reduction in

those prices by virtue of the distribution from the settlement fund in *Western Sugar*, The Coca–Cola Company became legally and equitably obligated to recompute and adjust the price at which it sold ... Coca–Cola Bottlers' Syrup ... during the years 1970–1974 as previously computed by The Coca–Cola Company to reflect the refund which The Coca–Cola Company received in the *Western Sugar* case.

Dkt. 570, ¶ 86. The plaintiffs "retroactive adjustment" claim rests on the contract pricing system tying the syrup price to the market price of sugar. The plaintiffs' claim fails for at least two reasons: (1) the defendant's *Western Sugar* recovery was predicated upon primarily its actual purchase costs from beet processors, which are not the relevant measures of market price under the contracts; and (2) no reliable determination that the *Western Sugar* defendants raised or fixed prices has been made.

This Court has held that the relevant measures of market price in terms of the Consent Decrees do not include the Company's actual costs of purchasing sugar. *See Coke III*, 654 F.Supp. at 1404 (discussing practice of tolling). The definition of market price set forth in *Coke III* specifically excludes "any individually negotiated discounts, allowances, or rebates" available to the Company. 654 F.Supp. at 1418. The plaintiffs do not directly contest that the *Western Sugar* recovery was based on the Company's actual purchase costs. Rather, they argue that the result of the *Western Sugar* defendants' alleged actions was that both "list and 'effective selling' prices of refined sugar [were] at abnormally high and non-competitive levels during the period 1970–1974." Dkt. 811, at 81.

Moreover, as the defendant correctly points out, of the refiners whose prices are relevant to the syrup price calculation—the ten largest cane sugar refiners, *see Coke III*, 654 F.Supp. at 1403 n. 18—only one refiner was a defendant in *Western Sugar*.[24] The rest of the antitrust defendants in *Western Sugar* were beet processors, whose prices are irrelevant to the determination of syrup prices for the bottlers.

Even had the plaintiffs somehow shown that beet sugar prices were relevant, their claim for restitution is speculative. There has been no determination that the market price of sugar was artificially inflated as a result of the *Western Sugar* defendants' actions. Their convictions do not establish by what amount market price may have been inflated or even that there was any effect at all on market price as a result of the antitrust defendants' conduct.[25] Consequently, in order to establish their rightful share of the fund, the plaintiffs would have had to offer evidence of the extent of the alleged effect on market price, an exercise which would border on the impossible in this context. Furthermore, the plaintiffs have not brought forward evidence of how much of the sugar purchased from the *Western Sugar* defendants was eventually included in syrup sold to the plaintiff bottlers. The source of the sugar in syrup bought by the plaintiff bottlers to the extent that it was from suppliers other than the *Western Sugar* defendants is irrelevant.

The plaintiffs rely heavily on a single decision, *Tennessee Ex Rel. Leech v. Dole*, 749 F.2d 331 (6th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985), for the proposition that the doctrine of mistake supports their restitution claim. That decision concerned an action by Tennessee against the federal government to enjoin the planned setoff by the Department of Transportation of funds recovered by the state in settlement of antitrust suits. The Court of Appeals held that the federal government was equitably enti-

---

**24.** The refiner was the California and Hawaiian Sugar Company. See Deposition of Stanley J. Konzal, Nov. 11, 1982, at 147–49 (Dkt. 300); Dkt. 811A, exh. I, at BY1142 (Wanning memorandum). The other refiner defendant was not one of the ten largest refiners.

**25.** Their convictions are not excluded from the Court's consideration, however, contrary to the defendant's assertion. Federal Rule of Criminal Procedure 11(e)(6)(B) is not apposite, because it pertains only to use of nolo contendere pleas "against the defendant who made the plea." Fed.R.Crim.P. 11(e)(6).

tled to recover a portion of the antitrust settlement proceeds received by the state. In *Dole*, however, the federal government granted the state approximately seventy-five percent of the price paid to the antitrust violators. Significantly, the grants were expressly subject to the condition that the bids be competitive. *See id.* at 333. The circumstances of the bottlers differ. They are not copurchasers, as the federal government and the state of Tennessee effectively were in *Dole.*

The Court will deny the plaintiffs' request for a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 (1982) determining that the Company must retroactively adjust the price of syrup during the period between 1970 and 1974 to reflect the settlement proceeds received by the Company in the *Western Sugar* antitrust litigation. There being a determination that the Company need not retroactively adjust the price, the Court will deny the rest of the plaintiffs' requests for relief on Count IV of the Supplemental and Amended Complaint and enter judgment in the defendant's favor.

## F. *Standing*

The final issue raised by the defendant's motion for partial summary judgment is whether any of the remaining plaintiffs have standing to enforce the Consent Decrees. The plaintiffs' standing to enforce the decrees has been disputed by the defendant (and doubted by the Court) from the beginning of the present litigation. *See Coke I*, 95 F.R.D. at 175 ("[T]he Court has serious reservations regarding the standing of Elizabethtown to assert rights under the 1921 judgments."). The Court withdrew this initial holding, leaving the standing issue until a more appropriate opportunity to explore it arose. That opportunity presented itself in *Coke IV*, 654 F.Supp. at 1429, which treated the bottlers' motion for summary judgment on the question of their standing.

■ *Coke IV*'s analysis of the standing question began with a sketch of the background pertinent to the issue. The salient background aspects for present purposes are that many of the bottlers now in the litigation derive their contractual legacy from the Thomas Company, rather than the Whitehead–Lupton Company. The only actual bottlers which intervened in the 1920 litigation, and which were therefore unquestionably parties to the decrees, were six bottlers from the Whitehead–Lupton territories. The six bottlers, however, intervened "for the use and benefit of themselves and of various other corporations, firms and individuals throughout the United States operating under contracts similar to those under which the petitioners are operating." PX1, Vol. VI–A, at 81 (petition of intervention). In *Coke IV*, the Court held that these bottlers intervened not just in their individual capacities, but on behalf of "all other bottlers operating under identical contracts." *Coke IV*, 654 F.Supp. at 1435. Therefore, even nonintervening Whitehead–Lupton bottlers enjoy party status as members of the class represented by the intervenors.

The Thomas Company's contracts with its actual bottlers differed importantly from those of the Whitehead–Lupton Company in that they were not perpetual. This difference led the Court in *Coke IV* to conclude that, whereas the intervening Whitehead–Lupton bottlers satisfied the then-existing requirements for class representation as to the rest of the Whitehead–Lupton bottlers, they could not have represented the Thomas bottlers, whose contracts were not perpetual. *Id.* at 1436. The effect of this conclusion was that bottlers from the Thomas territory lacked standing to enforce the decrees unless they established that the Thomas Company's rights to enforce the decrees had been validly assigned to them. The assignments of rights under the decrees to the actual bottlers were too limited, however, to confer standing to enforce the decrees to the extent the plaintiffs claimed. *Id.* at 1443.

■ The Company now moves for summary judgment as to the bottlers' standing, arguing that no bottler remaining in the litigation has standing to enforce the decrees. The remaining bottlers lack standing, according to the defendant, because

none of them is a descendant of the Whitehead–Lupton parent. The plaintiffs' weakly reply that "each of the plaintiffs (or its predecessors in interest) contracted with the Parent Bottlers who were plaintiffs in the 1921 litigation and parties to the 1921 Consent Decrees." Dkt. 811 at 82. This reply ignores the Court's previous holding that bottlers contracting directly with the Company are neither parties to the decrees nor members of the class represented by the intervening bottlers. *Coke IV*, 654 F.Supp. at 1433 n. 10. The reply similarly ignores the Court's previous holding with respect to the Thomas bottlers. *Id.* at 1436.

The plaintiffs have failed to identify any authority contradicting the basic principle referred to in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975): "[A] consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." The plaintiffs who are not parties or assignees of the pertinent rights under this Court's previous analysis in *Coke IV*, 654 F.Supp. at 1431–43, do not have standing to enforce the Consent Decrees.

The following bottlers contracted directly with the Company and therefore lack standing to enforce the decrees: Coca–Cola Bottling Company of Tucson; Natchez Coca–Cola Bottling Company;[26] Streator Coca–Cola Bottling Company; Jefferson City Coca–Cola Bottling Company; Trenton Coca–Cola Bottling Company; Sacramento Coca–Cola Bottling Company; Coca–Cola Bottling Company of Brownsville; Coca–Cola Bottling Company of LaCrosse; Love Bottling Company.

▆ The next group of plaintiffs, from the former Thomas territory, lack standing to enforce the decrees directly except to the extent they enjoy rights under the decrees through assignment, *see Coke IV*, 654 F.Supp. at 1443: Coca–Cola Bottling Company of Elizabethtown; Coca–Cola Bottling Company of Shelbyville; Kelford Coca–Cola Bottling Company; Plymouth Coca–Cola Bottling Company; Cleveland Coca–Cola Bottling Company; Coca–Cola Bottling Company of LeHigh Valley; Central Coca–Cola Bottling Company.

▆ The Company contends also that plaintiffs who contracted with an intermediate company other than the Whitehead–Lupton Company likewise lack standing under the Court's previous ruling. There are several plaintiffs in this category.[27] The Court agrees with the defendant that its previous standing ruling allows only plaintiffs whose contractual rights stem *directly* from the Whitehead–Lupton Co. as it existed in 1921 have standing as members of the class represented by the original intervening bottlers. The "Whitehead–Lupton" bottlers represented by the six intervening actual bottlers in Case No. 389 were limited to those contracting with the Whitehead–Lupton parent.

The Company's motion for summary judgment on the plaintiffs' standing is granted.

## IV. INTERVENTION

The bottlers first moved to intervene in the 1920 actions in the wake of *Coke I*, 95 F.R.D. 168, in which this Court expressed "serious reservations regarding the standing of Elizabethtown [the initial plaintiff] to assert rights under the 1921 judgments." *Id.* at 175. The Court viewed Elizabethtown's standing arguments as off-target, going more to whether Elizabethtown might have a right to intervene

---

**26.** Several individuals have been substituted as plaintiffs for Natchez. *See supra* n. 1.

**27.** The plaintiffs that apparently fall into this category are:
Coca–Cola Bottling Company of Magnolia
Coca–Cola Bottling Company of Dickinson
Coca–Cola Bottling Company of Jamestown
Laredo Coca–Cola Bottling Company
Coca–Cola Bottling Company Marshall
Coca–Cola Bottling Company Macon
Coca–Cola Bottling Company Deming
Coca–Cola Bottling Company San Angelo
Las Cruces Coca–Cola Bottling Company
Coca–Cola Bottling Company Inc. (Alexandria, Minnesota)
Coca–Cola Bottling Company of Tulsa

than to whether it enjoyed standing to enforce the decrees.

The weakness with Elizabethtown's position is that there is a fundamental difference between having the right to intervene in an ongoing action to protect interests which could be impaired by the resolution of that action, and bringing an action in the first instance to protect one's rights. It may well be that if this were an action instituted by a party to enforce the 1921 judgments, Elizabethtown could meet the requirements of Rule 24(a) of claiming "an interest relating to the property or transaction which is the subject of the action" and being "so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately protected by existing parties." Nevertheless, meeting such a requirement would not empower Elizabethtown to enforce the judgment itself, particularly in light of the Supreme Court's express statement in *Blue Chip Stamps,* that nonparties have no such rights.

*Coke I,* 95 F.R.D. at 176 (citation omitted). Finding Elizabethtown powerless to enforce the Consent Decrees directly, however, does not equate to rejecting its motion to intervene.

Upon reconsideration, I withdrew the *Coke I* holding that the bottlers lacked standing to enforce the Consent Decrees, *Coke II,* 98 F.R.D. 254, 264, concluding that I "need not have decided these issues in that they were not necessary for a determination of the class certification motion." *Id.* This temporary disposition of the standing questions delayed full consideration of the pending intervention motions, because if the bottlers had standing, there would be no need for intervention. *Coke II* thus reasoned that the "extraordinary circumstances" necessary to justify post-judgment intervention, *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* 674 F.2d 970, 974 (3d Cir.1982), were not then present, but added that if the standing issue was resolved against the bottlers, the intervention ruling would have to be revisited. *Coke II,* 98 F.R.D. at 278.

In *Coke IV,* I returned to the question of the standing of the bottlers to enforce the Consent Decrees, and found the statement in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975) seriously undermined the bottlers' arguments. *Coke IV,* 654 F.Supp. 1419, 1429. After reviewing the connection of the 1921 bottlers to the consent decree litigation, the degree of relationship between the plaintiff bottlers now before the Court and the bottlers on the scene in 1921, and the bottlers' various arguments, I held that bottlers whose contracts derived from the Whitehead–Lupton group of bottlers, some of which had intervened in the 1920 litigation, were parties to, and thus had standing to enforce, the consent judgments. *Id.* at 1435. The bottlers tracing their contracts back to the Thomas Co., however, were not original intervenors. Moreover, the Thomas Co.'s contracts with its actual bottlers were for a fixed term, and most of these contracts had expired by the time of the settlement agreements. *Id.* at 1436. Thus, the bottlers descended from the Thomas Co. lacked standing to enforce the decrees, except to the extent they received the Thomas Co.'s rights under the decrees through assignment. *Id.* at 1439.

For those bottlers who received rights through assignment prior to the Company's acquisitions of the parents, direct enforcement of the decrees is possible. However, the scope of the assigned rights was limited to "use of the Coca–Cola trademark, label and design, an exclusive license to bottle Coca–Cola, and the right to use the 'distinctive bottle for Coca–Cola.'" *Id.* at 1442 (quoting the form "Bottler's Contract," Plaintiff's Exhibit 44). Therefore, *Coke IV* concluded that the "[p]laintiffs' standing to sue for breach of the Consent Decrees by the Company would be limited to rights arising under Paragraph 8 of the Decrees [establishing trademark rights between the parents and the Company]." *Id.* at 1443.

Although *Coke IV* limited the plaintiffs' standing to enforce the Consent Decrees, the assignee status of the plaintiffs "does

directly affect the parties' rights under the Bottlers Contract." *Coke V*, 668 F.Supp. 906, 916. And the Consent Decrees' delineation of the terms of the agreement between the parents and the Company in turn informs the interpretation of the bottlers' contracts. *Id.* Because of this unusual nexus between the decrees and the contracts, the plaintiffs claim that they will be prejudiced if they are not allowed to intervene to modify or enforce the decrees. Now that the group of bottlers qualifying as parties to the Consent Decrees and thus conceivably representing the bottlers' interests has been further reduced by the departure of Shreveport Bottling Company [28] and no other plaintiff bottler has standing, they are seeking again to intervene in order to attempt to redress the perceived anomaly that, whereas strictly speaking they (or some of them) lack standing to enforce the decrees, their rights under their bottlers' contracts are informed in part by those decrees. See *Coke V*, 668 F.Supp. at 916 ("the right to receive 'syrup' assigned to the unamended bottlers includes the right to receive 'standard Bottlers Coca–Cola Syrup' under Paragraph 10 of the Consent Decrees").

 The fact that the plaintiffs lack standing, however, does not control the analysis of whether they are entitled to intervene. Plaintiffs lack standing because they were not parties to the decrees, not because of any constitutional requirement. As Judge Wright quite logically points out:

> An intervenor need not have [the] standing necessary to have initiated the lawsuit. It follows that, if an applicant for intervention would have had standing to bring the action originally, it has satisfied the interest requirement of Rule 24(a)(2).

*Indian River Recovery Co. v. The China,* 108 F.R.D. 383, 386–87 (D.Del.1985) (citations omitted). By definition, persons seeking to intervene are not parties. Equating the analyses of standing to enforce a decree and Rule 24 intervention is inconsistent with case law prohibiting collateral attacks on Consent Decrees based on the

opportunity to intervene. See *O'Burn v. Shapp,* 70 F.R.D. 549 (E.D.Pa.), *aff'd,* 546 F.2d 418 (3d Cir.1976), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977); see also *Coke IV,* 654 F.Supp. 1419, 1437 n. 16 ("[t]he determination of who is a party to a consent decree must be distinguished from questions of intervention under Federal Rule of Civil Procedure 24").

Federal Rule of Civil Procedure 24 enunciates the standard for intervention.

> Upon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a).

The plaintiffs have requested both intervention of right and permissive intervention. Four requirements must be met under Rule 24(a) before intervention will be permitted: (1) the bottlers must have a cognizable interest in the subject of the 1920 litigation; (2) their interest must be impaired by the "disposition" of the 1920 litigation; (3) their interest must be inadequately represented; and (4) the application must be timely.

 Preliminarily, I will examine the nature of the "litigation" in which the plaintiffs seek to intervene. Plaintiffs seek to intervene in C.A. Nos. 388 and 389. Filed in 1920, these cases were settled and closed in 1921. "Although consent judgments may be modified in light of changed circumstances, the standard for reopening such a judgment is a strict one." *National Wildlife Federation v. Gorsuch,* 744 F.2d 963, 968 (3d Cir.1984). The burden is heavy because " 'a healthy respect for the finality [sic] of judgments demands no less.' " *Mayberry v. Maroney,* 558 F.2d 1159, 1163 (3d Cir.1977). 'A consent decree is, after all, a judgment and is entitled to a pre-

---

**28.** Shreveport was the only plaintiff with uncon- tested standing to enforce the decrees.

sumption of finality.' *Delaware Valley [Citizens' Council for Clean Air v. Commonwealth],* 674 F.2d [987] at 981 [3d Cir. 1982]." *Id.* Intervening in litigation long over is close to the edge of the rule, which contemplates some intervention prior to the final "disposition." As the court in *Brown v. Board of Education,* 84 F.R.D. 383 (D.Kan.1979), commented: "As a general rule, consideration of a motion for leave to intervene presupposes the existence of an action into which intervention can be accomplished." *Id.* at 392. The requirement that there be a pending case is of course necessary to assure that the court has jurisdiction over the dispute in which the applicants seek to intervene. In the peculiar context of these Consent Decrees, however, the litigation, while long over, remains alive in the continuing operation of the decree.

This Court retains jurisdiction over the Consent Decrees. See *Coke II,* 98 F.R.D. at 275; defendant's answer, ¶ 33 (D.I. 13) ("The Company admits that the ... Court ... retains jurisdiction of the final decrees in Case Numbers 388 and 389 for the purpose of construing, interpreting, enforcing, or reforming those decrees...."); *see also United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) ("[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need"). Because the Consent Decrees are prospective in application, see *McGoff v. Rapone,* 78 F.R.D. 8, 24 (E.D.Pa.1978), and because they affirm the perpetuity of the contracts, an active controversy concerning their operation is possible even more than six decades later.

In order to establish the right to intervene, the plaintiffs must demonstrate that they have a "significantly protectable interest." *Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971); *see Diamond v. Charles,* 476 U.S. 54, 68, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986). The existence of a contractual link between the subject of the underlying action and the applicant's interest, however, does not automatically confer the requisite Rule 24 interest. *See Jet Traders*

*Investment Corp. v. Tekair, Ltd.,* 89 F.R.D. 560 (D.Del.1981); *see also Bank of America National Trust and Savings Ass'n v. Hotel Rittenhouse Associates,* 844 F.2d 1050, 1056–57 (3d Cir.1988) (dispute between developer and bank concerning failed building project perhaps did not give rise to interest sufficient to justify intervention by contractor). A precise guide to determining just what kind of interest satisfies Rule 24 is unavailable. *See Sanguine, Ltd. v. United States Department of Interior,* 736 F.2d 1416, 1420 (10th Cir. 1984), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 979 (1987); *United States v. Perry County Board of Education,* 567 F.2d 277, 279 (5th Cir.1978) ("no clear-cut test to determine the nature of the interest required"); *Nuesse v. Camp,* 385 F.2d 694, 700 (D.C.Cir.1967); 3B J. Moore, *Moore's Federal Practice* ¶ 24.07[02], at 24–57 (1982). As the court explained in *Nuesse:*

> We know of no concise yet comprehensive definition of what constitutes a litigable "interest" for purposes of standing and intervention under Rule 24(a).... [I]n the intervention area the "interest" test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.

*Nuesse,* 385 F.2d at 700. The Second Circuit Court of Appeals describes the interest sufficient to meet Rule 24's requirements as a "direct and immediate," rather than "remote or contingent" interest. *Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.,* 725 F.2d 871, 874 (2d Cir.1984). *See also United States v. American Tel. & Tel. Co.,* 642 F.2d 1285, 1292 (D.C.Cir.1980) ("[t]o be protected by means of intervention, the interest must be 'a legal interest as distinguished from interests of a general and indefinite character'") (quoting *Radford Iron Co. v. Appalachian Electric Power Co.,* 62 F.2d 940, 942 (4th Cir.1933)).

Examination of the relief sought in plaintiffs' proposed complaint in intervention (Dkt. 111), as clarified and updated at oral argument held in the diet Coke cases (C.A. Nos. 83–95 and 83–120, Dkt. 438), is

necessary to ascertain plaintiffs' interest in the 1920 litigation. On September 20, 1982 plaintiffs sought a declaratory judgment that the Consent Decrees precluded the Company from supplying bottlers syrup sweetened with HFCS without the consent of the bottlers. They also sought a ruling they were entitled to a pass-thru of the savings realized by the Company by reason of its substitution of HFCS for sugar. The bottlers further requested a declaratory judgment and monetary damages flowing from their assertion that "market price" as used in the Consent Decrees meant the price at which the refiners "actually quote and sell sugar" to the Coca–Cola Company and other large volume purchasers. Dkt. 111, p. 44.[29]

Events have partially overtaken the originally requested relief sought through intervention in the 1920 litigation. *Coke III* defined the term sugar as used in the consent decree which excluded HFCS from that definition. However, the bottlers' theory has now changed and, if permitted to intervene, they would seek to modify the 1921 decrees so as to entitle them to sugar sweetened with HFCS. Plaintiffs' right to the savings realized by the Company by reason of its use of HFCS in lieu of sugar likewise remains for trial.[30] *Coke III* also defined "market-price" as used in the decrees in a manner inconsistent with plaintiffs' proposed definition. In summary, *Coke III* and this opinion as it relates to the *Western Sugar* antitrust litigation dispose of most of what plaintiffs originally sought through their intervention in the 1920 litigation, with the exception of the alleged right to a pass-thru of savings from the Company's use of HFCS.

Plaintiffs now seek to intervene in the 1920 litigation to modify or alter the 1921 Consent Decrees to conform to their view of the facts as they exist today. These proposed modifications would presumably seek amendments to the Consent Decrees which would give the bottlers: (1) the unqualified right to receive bottler's syrup sweetened with HFCS; (2) a pricing structure tied to the price of HFCS, sugar or perhaps whatever sweetener is used in Bottler's Syrup; and (3) a definition of Coca–Cola Bottler's Syrup conferring the right to concentrates and all other syrups, including diet Coke, made by the Company and sold under the umbrella of the Coca–Cola trademarks.

The rationale for seeking to intervene to modify or alter the Consent Decrees are easily stated. First, the Court has repeatedly stated the Consent Decrees may be used to "inform" the meaning of the bottler's contracts. Consent Decrees revised in accordance with plaintiffs' desires would aid their cause. Second, the bottlers fear the Court will accept an interpretation of the Consent Decrees that would cause the Court to interpret the bottlers contracts as precluding "the bottlers from asserting a claim to any Coca–Cola syrup that uses a sweetener other than 5.32 pounds of sugar." Dkt. 438, p. 12. (Transcript of May 17, 1988 Argument)

At bottom, plaintiffs' motion to intervene to seek modification in the light of the alleged changes of the factual premises of the decrees is an alternative should the Court not adopt plaintiffs' theories and interpretation of their bottler contracts. Stated differently, if plaintiffs prevail on their interpretation of the bottlers contracts, the subject of this litigation, there would be no need to intervene in the long-closed 1920 litigation. If, on the other hand, the Company's interpretation of the bottlers' contracts is adopted, plaintiffs would need the alternate position of a modified decree. *Id.* at p. 14.

The Court has already examined the existence of an interest in the decrees on the plaintiffs' part in *Coke II:*

> The concept of a legally protectible interest sufficient to sustain intervention as of right is amorphous. Readily apparent in factual contests [sic] where the disputed interest is a claim to a property

---

**29.** Plaintiffs also sought alleged damages resulting from the *Western Sugar* antitrust litigation which has been denied after trial. *See supra,* Sec. E, pp. 87–90.

**30.** *See, supra,* § B, *infra,* pp. 75–80.

interest, it eludes judicial definition in a more subtle factual matrix. One commentator has suggested it embraces aspects of standing. 3B J. Moore, *Moore's Federal Practice* ¶ 24.07[02]. Another commentator has suggested not tarrying over the concept, but looking instead to whether the asserted interest would be impaired by disposition of the litigation. See 7A Wright, Miller & Kane § 1908. The Supreme Court has instructed that there need not be a direct interest in the property or transaction at issue provided that the averted interest would be impaired by the outcome. *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 135–36 [87 S.Ct. 932, 936–37, 17 L.Ed.2d 814 (1967). Adverse holdings to plaintiff would substantially impair the ability of the non-diverse intervening plaintiffs insofar as it would embrace this Court's construing its own consent decree. *See In re Fine Paper Antitrust Litigation*, 695 F.2d [494] at 498 [3d Cir.1982]. To the extent those hypothetical outcomes are considered to emanate from construction of the 1921 Consent Decrees rather than an unamended Bottler's Contract, it would have a unique and unusually strong stare decisis effect. 3B J. Moore, *Moore's Federal Practice*, ¶ 24.07[3]. Moreover, to the extent there is identity of language in the Bottler's Contracts and that language receives its first judicial interpretation, the stare decisis effect would necessarily be important.... As a practical matter adverse determination of the common issues under the Consent Decrees would seriously undermine if not completely obliterate proposed intervening plaintiffs' chances of prevailing in this or other forums on these issues. *Coke II*, 98 F.R.D. at 280–81 n. 68.

The stare decisis concern quoted above loses much of its force given that the 1921 Consent Decrees will "inform" but not control the question of interpretation of the bottlers contracts. Similarly, the effect of an adverse determination has been muted by the fact that in *Coke III* plaintiffs partially prevailed in the determination of Consent Decree common issues. Plaintiffs'

perception that the receipt of what they sought in the determination of the common issues weakens their position at trial is chargeable solely to their changed position and litigation strategy.

Because the employment of the 1921 Consent Decrees in this litigation is limited to "informing" the meaning of the bottlers contracts, and intervention in the long closed 1920 litigation is sought as an alternative to a result adverse to plaintiffs, plaintiffs' interest is too attenuated to warrant intervention. Plaintiffs have not demonstrated they have "a significantly protectable interest" within the meaning of Rule 24(a). Because the plaintiff bottlers lack the requisite interest to warrant intervention under Rule 24(a), the Court will not further lengthen the saga by discussion of the other criteria of Rule 24(a).

Permissive intervention will also be denied to plaintiffs. Permissive intervention applies if an "applicant's claim or defense and the main action have a question of law or fact in common." Permissive intervention under Rule 24(b)(2), even more so than intervention of right under Rule 24(a), presupposes an ongoing dispute between the original parties, which is not the case here. *See* J.B. Moore, *Moore's Federal Practice*, ¶ 24.10[1], at 24–111 (1987) (administrative efficiency is basic rationale for rule allowing permissive intervention).

The order to be entered will deny plaintiffs' motion to intervene in the 1920 litigation.

## V. CONCLUSION

The Company's motion for partial summary judgment with respect to Counts One, Two, and Three of the Supplemental and Amended Complaint will be denied. The Court will enter judgment in favor of the Company on Count Four, and on the plaintiff's claim for punitive damages on Count Two. The Company's motion for summary judgment on the plaintiffs' standing to enforce the decrees will be granted.

Plaintiffs' motion to intervene in the 1920 litigation will be denied.